# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | | |
|---|---|---|
| ALISON VALENTE, | ) | |
| | ) | CASE NO. _____ |
| *Plaintiff,* | ) | |
| | ) | |
| V. | ) | **JURY TRIAL DEMANED** |
| | ) | |
| INTERNATIONAL FOLLIES, INC. | ) | |
| (D/B/A THE CHEETAH), JOHN | ) | |
| "JACK" BRAGLIA, WILLIAM | ) | |
| HAGOOD, SAMANTHA KIM, | ) | |
| HOLLY WOOD, HEATHER | ) | |
| OVERTURF, JOHN HAVEN (D/B/A | ) | |
| NATIONAL LIMOUSINE), TRAC- | ) | |
| ERIC, INC. A/K/A TRAC ERIC, INC., | ) | |
| ROBERT "BOB" JOHNSON, | ) | |
| LEE TATUM, CHRIS HALEY | ) | |
| MARK HOLCOMB, TOMMY | ) | |
| PONISH, and PHILLIP JOHSON | ) | |
| | ) | |
| | ) | |
| *Defendants.* | ) | |

## VERIFIED COMPLAINT

**COMES NOW** Alison Valente (hereinafter "Plaintiff" or "Valente") and

brings this first amended action against International Follies, Inc., doing business as

the "Cheetah" ("The Cheetah"), Trac-Eric, Inc., ("Trac-Eric"), John Haven, upon

information and belief, doing business as National Limousine ("National

Limousine"), Mr. William Hagood ("Hagood"), Mr. John "Jack" Braglia ("Braglia"), Ms. Heather Overturf ("Overturf"), Ms. Holly Wood ("Wood"), Mr. Robert Johnson ("Johnson"), Ms. Samantha Kim ("Kim," and collectively with Hagood, Wood, Johnson, Overturf, and Braglia, referred to as the "Conducting Supervisor Defendants"), Lee Tatum ("Tatum"), Christopher Haley ("Haley"), Mark Holcomb ("Holcomb"), Tommy Ponish ("Ponish"), Philip Johnson ("P. Johnson") (collectively with Johnson, Tatum, Haley, Holcomb, Ponish, and P. Johnson, referred to as the "Conducting Floor Manager Defendants") (hereinafter, each of the foregoing are collectively referred to as "Defendants"), respectfully showing the Court as follows:

## __INTRODUCTION__

### 1.

The Cheetah, Hagood, and Braglia operate an adult entertainment establishment in Fulton County commonly known as The Cheetah ("The Cheetah Lounge"). Ms. Valente was the direct target of a crime syndicate operated by Defendants that had the purpose of offering a menu of illegal goods and services to its high-end clientele (the "Menu of Illegal Goods and Services" or the "Menu"). The Menu of Illegal Goods and Services includes illegal drugs and prostitution. This Menu also included the "Bill Cosby special"—the unknowing drugging of a girl at

The Cheetah for a high net worth individual who wants to engage in activities of prostitution but the girl would not participate consensually.  The goods and services were open to high dollar patrons of The Cheetah, and were sold to such patrons by and through Defendants' crime organization comprised of The Cheetah, the Conducting Supervisor Defendants, Conducting Floor Manager Defendants, Trac-Eric, and National Limousine, each of which plays a part in directing and conducting the Enterprise's affairs, and which accomplish prostitution and illegal drug distribution, administration, and sales through the Identified Personnel, as further described below.

2.

At one time, The Cheetah Lounge was known to be a reputable adult entertainment establishment that was free from illegal activity and was truly a "gentlemen's club."  However, since the shutdown of the infamous Gold Club of Atlanta ("Gold Club"), the activities for which the Gold Club became infamous – drugs, prostitution and other illegal activity, and for which it was eventually shut down, have migrated to The Cheetah Lounge.  The Cheetah Lounge is now a central point of organization for a morass of illegal activities, including a pattern of sexual abuse, assault, harassment, drug distribution and sale, prostitution, attempted rape, racketeering, illegal drugging, pimping, and pandering carried out by Defendants,

including The Cheetah, the Conducting Floor Manager Defendants, the Conducting Supervisor Defendants, the Identified Personnel, Trac-Eric, and National Limousine (the "Enterprise"). Each of The Cheetah, Conducting Supervisor Defendants, Conducting Floor Manager Defendants, Identified Personnel, Trac-Eric, and National Limousine play a part in directing/conducting the affairs of the Enterprise and derive income from the pattern of illegal activities.

3.

Ms. Valente was fired after having worked for The Cheetah for almost sixteen (16) years with no previous work performance problems or any other warnings, chargebacks (as sole salesperson), or terminations until after she raised complaints to The Cheetah, which resulted from Ms. Valente's refusal to participate in the activities that had become a regular part of The Cheetah's operations. On a first occasion in August of 2014, Ms. Valente was allegedly fired for a "chargeback." It was later determined that the alleged "chargeback" claim was entirely false. On the second (and last) occasion, in February of 2015, Ms. Valente was fired for an alleged "chargeback" but was never informed of the details of the alleged "chargeback."

4.

In fact, these allegations by The Cheetah are fabrications designed to mask the true reason for Ms. Valente's termination: her attempt to complain to

management about illegal activities occurring in the club including pandering, prostitution, and drug activity, and her request to have The Cheetah refrain from directing such activities towards her.  For instance, customers are directed to enjoy VIP rooms with the Fun Girls,[1] several of which travel across state lines to work at The Cheetah at the behest of the Conductor Manager Defendants and The Cheetah. These Fun Girls kick back between 20%-60% of their income to Conducting Floor Manager Defendants that, in exchange, grant protection (in the form of blocking doors, etc.) that allow these and other illegal activities to occur.  Ms. Valente's non-compliance with these activities and her complaints concerning the same ultimately led to her termination.

5.

Put simply, the ability to earn good money now (as opposed to in the past) at The Cheetah Lounge is premised on performing sexual favors for The Cheetah customers and tolerating sexual misconduct by supervisors, including operations management personnel, "house moms" and "Conducting Floor Manager Defendants."  The Conducting Supervisor Defendants and the Conducting Floor

---

[1] The "Fun Girls" are those who willingly participate in prostitution, submit to illegal "floor manager" kickbacks/charges, and lure high spending patrons like professional NFL, NBA, and MLB players, musicians, and other star patrons back to the club.

Manager Defendants require/exert extreme pressure on entertainers to perform sexual favors for customers of The Cheetah so that they may get kickbacks from such activities.

6.

Because Ms. Valente refused to participate, she was intimidated, abused, and sexually harassed and humiliated in an attempt to force her to quit, and when she did not, The Cheetah fabricated a reason to fire her so they could get rid of her after she continually complained of the illegal activities to Jack Braglia, Robert "Bob" Johnson, and Holly Wood, among others.

7.

Despite her refusal to willingly participate in the illegal activities happening at The Cheetah Lounge, the development of the Enterprise that is operated from within and without The Cheetah Lounge damaged Ms. Valente economically in her business and property.  For example, on one occasion, Ms. Valente was speaking with a client, who then decided to head to the VIP Room with her, after agreeing to engage Ms. Valente's entertainment services.  Haley intercepted the putative client's friend as Ms. Valente and the client were walking away, and Haley pulled him to the side and whispered in his ear.  His friend shouted to Ms. Valente's client (they were now several feet away) "Wait! Don't go with her," and his friend motioned for the

client to come back and talk to Haley. The putative client was adamant on going with Ms. Valente saying that he was quite sure he chose the right entertainer and was very happy with his choice.   The friend convinced Ms. Valente's customer to join him and Haley for a chat. Ms. Valente's client then returned and said, though Ms. Valente was "beautiful" and "just his type," "the bouncer had girls who were more (made quotations gesture with hands) fun." Haley and the putative client did a handshake/exchange.  Ms. Valente then described the entire incident to P.Johnson and Overturf.  Although exemplary, the sale of illegal drugs and services from the Menu directly affected Ms. Valente in the form of her losing clients (in the magnitude of hundreds of client transactions) because she refused to willingly participate in prostitution and the consumption and distribution of illegal drugs.  It also affected her via the keying of her car, creating physical damage to her vehicle caused directly from her refusal to participate in said activities.

8.

But this was by far not the worst of the damage.  It also affected her physically in the form of her illegal drugging and abuse (described below), and emotionally in the form of mental anguish and depression.   In fact, after being free of the environment and stimulus, Ms. Valente has spent a substantial portion of her time overcoming the psychological and emotional weight of her experiences. She has

sought help from therapists and acupuncturists.  She has also attempted to employ cleanses, herbal remedies, and a myriad of conventional and alternative approaches in an attempt to heal on every level from the damage done from her time at The Cheetah Lounge.

9.

The operation of The Cheetah Lounge by The Cheetah is facilitated by Trac-Eric through the use of a lease of the properties located at 887 Spring St NW, Atlanta, GA 30308, which is granted to the beneficial use of The Cheetah.  Based upon public information, Trac-Eric is a company that owns and operates two separate parcels of land located at 887 Spring St NW, Atlanta, GA 30308, one of which is currently used as a parking lot for The Cheetah Lounge and the other upon which the building that is home to The Cheetah Lounge and Alluvia Restaurant is located—both parcels are necessary for operation of the Enterprise and Trac-Eric plays a part in conducting/directing the Enterprise's affairs.   Trac-Eric is one entity in a complicated network of companies that is ultimately owned and controlled by William Hagood, and this entity has knowledge of and directs the Enterprise through the provision of land for benefit of the Enterprise, and Trac-Eric received financial benefit in the form of revenues from the operation of the Enterprise.  The Cheetah Lounge is the physical structure where much of the Enterprise's business is

conducted, and it is also the location to which high-net worth customers of The Cheetah travel to partake in the Menu and girls from all around the country travel to work as entertainers.  Trac-Eric, its property, and its actions are necessary for the operation of the Enterprise, and the owner, Bill Hagood, does have knowledge of the racketeering activities of the Enterprise.

10.

National Limousine (John Haven) conducts/directs the affairs of the Enterprise by providing transportation to and from The Cheetah Lounge for high-net worth customers and through the provision of illegal drugs that it transports into The Cheetah Lounge at the request of the Conducting Floor Manager Defendants and the Conducting Supervisor Defendants (through Identified Personnel of the same, i.e., the Identified Personnel) in order that the Enterprise may operate. National Limousine operates a vehicle that remains stationed at The Cheetah Lounge at almost all times.  The limousine owned and operated by National Limousine was at one time owned by The Cheetah but was sold and/or transferred to National Limousine in order to create separation between its illegal drug trafficking and the internal operations of The Cheetah but it and its actions are nonetheless necessary to the operation of the Enterprise and plays a part in directing the Enterprise's affairs with respect to illegal drug distribution within the Enterprise.

11.

The Cheetah and the Conducting Supervisor Defendants conduct/direct the affairs of the Enterprise, including, without limitation, contracting with the Conducting Floor Manager Defendants and Identified Personnel for their services and supervising/controlling the same, contracting with and ensuring the operation of the National Limousine and its presence at The Cheetah Lounge to ensure the provisions of illegal drugs to the Enterprise, ensuring the availability of non-cash transactions and Cheetah Bucks,[2] conducting damage control in the case the illegal goods and services from the Menu cause problems at The Cheetah Lounge (dealing with drug overdoses, reports of rape and attempted rape, sexual assault), ensuring these problems do not get reported to the police, and overseeing all of the foregoing in accomplishing the goal of profiting from the Enterprise.  Each of The Cheetah and

_____

[2] The Cheetah provides the means for high-net worth customers to purchase illegal goods and services from the Menu without cash by issuing Cheetah Bucks to its customers, which are used to pay the Conducting Floor Manager Defendants, the Conducting Supervisor Defendants, and the Identified Personnel for the goods and services the high-net worth customer purchases from the Menu.  Cheetah Bucks are equivalent to cash in The Cheetah Lounge and are generated by processing the credit cards and The Cheetah issuing Cheetah Bucks (1 Cheetah Buck being equivalent to 1 U.S. Dollar) to enable the conduct of the Enterprise's affairs.  The Cheetah charges a 10% fee to the customer for each Cheetah Buck that The Cheetah issues to a customer, thereby profiting from the purchases of illegal goods and services from the Menu.

Conducting Supervisor Defendants play a part in conducting/directing the Enterprise's affairs, and The Cheetah and the Conducting Supervisor Defendants and their actions are necessary in order that the Enterprise may operate.  The Cheetah and Conducting Supervisor Defendants receive a portion of the profits of the Enterprise, with the Conducting Supervisor Defendants receiving monies directly from the tip pooling funded by the Identified Personnel, through direct and indirect payments from the Identified Personnel, and from direct and indirect payments from high net worth customers, and The Cheetah receiving monies directly and indirectly in the form of VIP room fees, entry fees, alcohol sales, Cheetah Buck sales, and through other sales ancillary to the provision of the illegal goods and services.

## 12.

The Conducting Floor Manager Defendants conduct/direct the affairs of the Enterprise, including, without limitation, coordinating with National Limousine to ensure the provisions of illegal drugs to the Enterprise, conducting damage control in the case the illegal goods and services from the Menu cause problems at The Cheetah Lounge (dealing with drug overdoses, reports of rape and attempted rape, sexual assault), providing physical protection so the illegal goods and services from the Menu can be carried out, identifying high net worth individuals that seek illegal goods and services, facilitating the provision of the illegal goods and services, and

overseeing all of the foregoing in accomplishing the goal of profiting from the Enterprise.  Each of the Conducting Floor Manager Defendants play a part in conducting/directing the Enterprise's affairs, and the Conducting Floor Manager Defendants and their actions are necessary in order that the Enterprise may operate. The Conducting Floor Manager Defendants receive a portion of the profits of the Enterprise, with the Conducting Floor Manager Defendants receiving monies directly from the tip pooling funded by the Identified Personnel and through direct and indirect payments from the Identified Personnel, and through direct and indirect payments from high net worth customers for the illegal goods and services.

13.

The Identified Personnel, which includes at least Jane Doe Witnesses 1-7 (exemplary details below) and Jane Does 8-13, are used and victimized by the Enterprise to profit and provide the illegal goods and services that form the core of the Enterprise (the "Identified Personnel").  The Identified Personnel either were pandered by the Conducting Floor Manager Defendants and Conducting Supervisor Defendants, thereby prostituting themselves, and/or sold illegal drugs or were administered illegal drugs at the direction and control and with knowledge of the Enterprise to accomplish the goals of the Enterprise.

14.

The roles of the Defendants in the Enterprise's operations are identified above, and the interplay of the Defendants' role such that the Enterprise operates are as follows:

- High-net worth customer enters The Cheetah Lounge after being brought there by National Limousine or through his or her own transportation.

- A Conducting Floor Manager Defendant greets and/or intercepts the customer at the door if he suspects or knows him to be a high net worth individual, takes the customer aside, and after surveying his needs and desires—and if it is confirmed that the customer is a high-net worth customer—the Conducting Floor Manager Defendant explains to the customer that there exists a Menu of Illegal Goods and Services (while of course not explicitly calling it that). If the Conducting Floor Manager Defendant recognizes the customer as someone who has utilized the Menu previously, he asks him what he wants off of the Menu and begins making the arrangements.

- In the case it is a first-time visit for the high-net worth customer, the Conducting Floor Manager Defendant  whispers discretely  and conveys the "Menu of Illegal Goods and Services" to the customer or

the customer asks directly if they can get some illegal drugs or engage in a certain sexual act. This Menu includes: illegal drugs, including at least gamma-hydroxybutyric acid (GHB), ketamine, and/or cocaine; girls that are willing to engage in acts of prostitution in a private and guarded (by the Conducting Floor Manager Defendants) room; girls who may or may not be willing to engage in acts of prostitution in a private and guarded (by the Conducting Floor Manager Defendants) room but who may be pressured to do so by the customer and with an agreement that the Conducting Floor Manager Defendants will not check the room so that the customer may do as he pleases; or "The Bill Cosby Special:" a girl working that night but that is not open to prostitution but has been unknowingly drugged with illegal drugs in a private and guarded (by the Conducting Floor Manager Defendants) room.

- The customer "places" his order.  If the transaction for illegal drugs/good and/or services is not in cash, the operative Conducting Floor Manager Defendant directly or indirectly facilitates the issuance of Cheetah Bucks for purposes of payment for the illegal drugs/goods and/or services.

- If the order involves illegal drugs, the operative Conducting Floor Manager Defendants either acquire the drugs via National Limousine and/or Identified Personnel, which, among other channels, courier the drugs into The Cheetah Lounge.   Once the drugs are in The Cheetah Lounge, the Identified Personnel are engaged to bring the drugs into the room that is to be reserved by the Conducting Floor Manager Defendants.  If the order involves the "Bill Cosby Special", those drugs are eventually placed in the subject entertainers' drink without their knowledge or consent at the direction and consent of the Conducting Floor Manager Defendants.

- Defendants Kim, Wood, Overturf, or other operative "house mom" that is working ensures the girls are properly primped, including hair, make-up, nails, and attire.

- The operative Conducting Floor Manager Defendant reserves a room for the customer, brings/directs the subject Non-defendant Conspirator and customer to the room.  The customer pays The Cheetah for use of the room through the Conducting Floor Manager Defendants, pays the girl for any prostitution or drugs that has been negotiated with the Conducting Floor Manager Defendants or Identified Personnel, and/or

pays the Conducting Floor Manager Defendant for facilitating the illegal goods or services and providing security so that the illegal goods and services can be used privately without interruption.

- If the customer has ordered illegal drugs, those drugs are brought into the room directly to the customer by one of the Identified Personnel or, in the case of the "Bill Cosby Special," via a drink given to the subject entertainer.  The Conducting Floor Manager Defendant guards (and ensures nobody goes in) the room to ensure that the customer can use the illegal goods and participate in whatever service was purchased (and provided by Identified Personnel) without interference from others.

- After the lease on the room is over, the Conducting Supervisor Defendants (operative house moms and management), ensure that the subject entertainer continues to work throughout the night, stays primped and presentable, and continue to work despite any assault, sexual or otherwise, that occurs.  If a girl is unconscious as a result of being drugged for the purposes of sexual abuse, or was otherwise the subject of unwanted advances or abuse, Conducting Supervisor Defendants (including operative house moms) ensure the girl is

removed from the room and either continues to work or is removed through the back door of The Cheetah Lounge, depending on how severe the condition of the girl.  The Conducting Supervisor Defendants also deal with any threats to go to the police, adverse emotional effects being experienced by the girls (often through the administration of alcohol or more drugs), complaints from non-participating entertainers regarding the illegal goods and services, and any other situations that arise as a result of the illegal goods and services purchased from the Menu.

- The illegal goods and services are used by the high-net worth customer in a private "VIP" room or otherwise in a private area of The Cheetah Lounge.

- The Identified Personnel pay a portion of their income from the customer to the Conducting Floor Manager Defendant for steering the customer her way and watching the door so that the illegal goods and services could be used.  The Conducting Floor Manager Defendant may also receive payment directly from the customer, as well.

- The Conducting Floor Manager Defendant pays a portion of his payment to the Conducting Supervisor Defendants, who in exchange

ensure that the Enterprise continues to function smoothly and allows the Conducting Floor Manager Defendant to further the financial interests of the Enterprise without having to deal with any collateral damage that could ensue if any issues are not contained.

• The Cheetah derives income through at least the payment of house fees from the Identified Personnel, room fees (fees for exclusive use of a room) from the customers, provision of alcohol, and the issuance of Cheetah Bucks (10% issuance fee).  Defendants Braglia, The Cheetah, and Hagood also directly receive a portion of all monies generated through the issuance of Cheetah Bucks, which are used to facilitate the monetary exchange fueling the Enterprise.

The *modus operandi* of the "Enterprise" as alleged herein, including this paragraph, comprises the foregoing activity and roles identified in Paragraphs 11-15 above (the "Means of Operation").

## PARTIES, SERVICE, AND JURISDICTION

### 15.

Plaintiff is a former employee of The Cheetah and is a resident within the Northern District of Georgia.  Plaintiff Valente was employed by The Cheetah from February 1999 to February 26, 2015.

16.

Defendant International Follies, Inc., doing business as The Cheetah, is a Georgia for profit corporation with its principal place of business located at 887 Spring Street NW, Atlanta, Georgia 30308. Defendant International Follies, Inc. is the legal owner of The Cheetah Lounge and invests in and is the legal entity most closely associated with the Enterprise.  Defendant The Cheetah may be served with a copy of the summons and complaint by leaving a copy with its registered agent for service, Mr. William Hagood, located at 887 Spring Street NW, Atlanta, Georgia, 30308.  International Follies, Inc. also invests in the Enterprise, is the legal entity most closely associated with the Enterprise and through which much of the profits and accounting flows, and exercises control over all the operations and procedures and does actively conduct/direct the affairs of the Enterprise, and accordingly, plays a part in conducting/directing the Enterprise's affairs.

17.

Defendant William Hagood is a natural person that, along with Defendants Braglia, Wood, and Kim, exercises control over all the operations and procedures and does actively conduct/direct the affairs of The Enterprise from within and without the adult entertainment establishment known as The Cheetah located at 887 Spring Street NW, Atlanta, Georgia, 30308, and accordingly, plays a part in

directing/conducting the Enterprise's affairs.  Defendant Hagood is a beneficial owner of The Cheetah and is a part-time resident within the Northern District of Georgia. Defendant Hagood may be served with a copy of the summons at the address identified in the respective summons.  Defendant Hagood is named in his individual capacity.  Defendant Hagood also controls Trac-Eric.

18.

Defendant Jack Braglia is a natural person that, along with Defendants Hagood, Wood, and Kim, exercises control over all the operations and procedures and does actively conduct/direct the affairs of the Enterprise from within and without the establishment known as The Cheetah Lounge located at 887 Spring Street NW, Atlanta, Georgia, 30308, and accordingly, plays a part in directing/conducting the Enterprise's affairs.   Upon information and belief, Defendant Braglia is also a contingent beneficial owner of The Cheetah and, upon information and belief, is a resident within the Northern District of Georgia. Defendant Braglia may be served with a copy of the summons at the address identified in the respective summons.    Defendant Braglia, the General Manager and part owner of the club, is named in his individual capacity.

19.

Defendant Kim is a natural person that, along with Defendants Hagood,

Wood, and Braglia, exercises control over all the operations and procedures and does actively conduct/direct the affairs of the Enterprise from within and without the establishment known as The Cheetah Lounge located at 887 Spring Street NW, Atlanta, Georgia, 30308, and accordingly, plays a part in directing the Enterprise's affairs.  Upon information and belief, Defendant Kim is a resident within the Northern District of Georgia.  Defendant Kim may be served with a copy of the summons at the address identified in the respective summons.  Defendant Kim is named in her individual capacity.

20.

Defendant Wood is a natural person that, along with Defendants Hagood, Kim, and Braglia, exercises control over all the operations and procedures and does actively conduct/direct the affairs of the Enterprise from within and without the establishment known as The Cheetah Lounge located at 887 Spring Street NW, Atlanta, Georgia, 30308, and accordingly, plays a part in directing the Enterprise's affairs. Upon information and belief Defendant Wood is a resident within the Northern District of Georgia.  Defendant Wood may be served with a copy of the summons at the address identified in the respective summons.   Defendant Wood is named in her individual capacity.

21.

Defendant Johnson is a natural person that actively conducts/directs the operations and procedures as a floor manager of the Enterprise at the establishment known as The Cheetah Lounge located at 887 Spring Street NW, Atlanta, Georgia, 30308, and accordingly, plays a part in conducting/directing the Enterprise's affairs. Upon information and belief, Defendant Johnson is a resident within the Northern District of Georgia. Defendant Johnson may be served with a copy of the summons at the address identified in the respective summons. Defendant Johnson is named in his individual capacity.

22.

Defendant Tatum is a natural person that actively conducts/directs the operations and procedures as a floor manager of the Enterprise at the establishment known as The Cheetah Lounge located at 887 Spring Street NW, Atlanta, Georgia, 30308, and accordingly, plays a part in conducting/directing the Enterprise's affairs. Upon information and belief, Defendant Tatum is a resident within the Northern District of Georgia. Defendant Tatum may be served with a copy of the summons at the address identified in the respective summons. Defendant Tatum is named in his individual capacity.

23.

Defendant Haley is a natural person that, until recently, actively

conducted/directed the operations and procedures as a floor manager of the Enterprise at the establishment known as The Cheetah Lounge located at 887 Spring Street NW, Atlanta, Georgia, 30308, and accordingly, played a part in conducting/directing the Enterprise's affairs. Upon information and belief, Defendant Haley is a resident within the Northern District of Georgia. Defendant Haley may be served with a copy of the summons at the address identified in the respective summons. Defendant Haley is named in his individual capacity.

24.

Defendant Holcomb is a natural person that actively conducts/directs the operations and procedures as a floor manager of the Enterprise at the establishment known as The Cheetah Lounge located at 887 Spring Street NW, Atlanta, Georgia, 30308, and accordingly, plays a part in conducting/directing the Enterprise's affairs. Upon information and belief, Defendant Holcomb is a resident within the Northern District of Georgia. Defendant Holcomb may be served with a copy of the summons at the address identified in the respective summons. Defendant Holcomb is named in his individual capacity.

25.

Defendant Ponish is a natural person that actively conducts/directs the operations and procedures as a floor manager of the Enterprise at the establishment

known as The Cheetah Lounge located at 887 Spring Street NW, Atlanta, Georgia, 30308, and accordingly, plays a part in conducting/directing the Enterprise's affairs. Upon information and belief, Defendant Ponish is a resident within the Northern District of Georgia.  Defendant Ponish may be served with a copy of the summons at the address identified in the respective summons.   Defendant Ponish is named in his individual capacity.

26.

Defendant Phillip Johnson (or P. Johnson) is a natural person that actively conducts/directs the operations and procedures as a floor manager of the Enterprise at the establishment known as The Cheetah Lounge located at 887 Spring Street NW, Atlanta, Georgia, 30308, and accordingly, plays a part in conducting/directing the Enterprise's affairs.  Upon information and belief, Defendant P. Johnson is a resident within the Northern District of Georgia.  Defendant P. Johnson may be served with a copy of the summons at the address identified in the respective summons.   Defendant P. Johnson is named in his individual capacity.

27.

Defendant John Haven, doing business as National Limousine, is a natural person that actively directs the operations and procedures of the driving service that traffics illegal drugs into, sells illegal drugs within, and chauffeurs high-net worth

customers into the establishment known as The Cheetah Lounge located at 887 Spring Street NW, Atlanta, Georgia, 30308, and accordingly, plays a part in conducting/directing the Enterprise's affairs.   Upon information and belief, Defendant Haven/National Limousine is a resident within the Northern District of Georgia.  Defendant Haven/National Limousine may be served with a copy of the summons at the address identified in the respective summons. Defendant Haven/National Limousine is named in his individual capacity.

28.

Trac-Eric, Inc., is a Georgia for profit corporation with its principal place of business located at 887 Spring Street NW, Atlanta, Georgia 30308.  Defendant Trac-Eric, LLC provides the real estate on which The Cheetah Lounge operates and fully controls that property and provides a lease on that property to the benefit of The Cheetah, and plays a part in conducting/directing the Enterprise's affairs through the knowing provision of real estate for use in operating the Enterprise. Defendant Trac-Eric may be served with a copy of the summons and complaint by leaving a copy with its registered agent for service Mr. William Hagood located at 887 Spring Street NW, Atlanta, Georgia, 30308.

29.

This Court has subject matter jurisdiction over federal questions raised under

the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §1962. The jurisdiction of this Court is invoked to redress the racketeering and corrupt acts of the Enterprise under 18 U.S.C. §1962.  The unlawful acts alleged herein took place within the Atlanta Division of the Northern District of Georgia.

30.

Venue is proper in the Northern District of Georgia, under 28 U.S.C. §1391(b), since Plaintiff and, upon information and belief, Defendants are citizens in this judicial district.  In addition, a substantial part of the events or omissions giving rise to the claims occurred in this judicial district at the address commonly known as 887 Spring Street NW, Atlanta, Georgia, 30308 located within the Northern District.

## **FACTUAL ALLEGATIONS**

31.

At all relevant times, Ms. Valente was employed by The Cheetah as an entertainer at The Cheetah adult entertainment club.

32.

### **THE YEAR 2010**

33.

The events leading to these claims began in 2010, after the Gold Club was

shut down for illegal activities, including drugs and prostitution. After the shutdown of the Gold Club, the activities that were once only present in the Gold Club began to migrate to The Cheetah, which was formerly a reputable establishment. The earliest start of the new regime began with a floor manager Holcomb and a dancer with the stage name "Farrah" (Rachel Flanigan). After these two began the business relationship, Holcomb would refer high paying customers that wanted more than dances (*i.e.,* sexual favors) to "Farrah." In return, Farrah would tip Holcomb generously.

34.

Over a short amount of time, other girls interested in higher pay that came with sexual favors joined Holcomb's camp. "Farrah" maintained the highest rank of the girls, and all girls that were part of the arrangement agreed to pay 20% of their earnings to Holcomb. While the job of floor managers was originally to provide security and protection from aggressive customers and to prevent lewd things from happening in The Cheetah, if these girls provided a high enough percentage of their earnings to the floor managers, the floor managers would allow sexual favors/activities and drug use to occur in private VIP rooms.

**SPRING AND SUMMER OF 2013**

35.

By 2013, what was once just a few girls involved in a give-and-take agreement, quickly morphed into a sophisticated organized crime syndicate of floor managers (each of the Conducting Floor Manager Defendants) and girls that would sell sex and drugs at The Cheetah.  These girls were known as the "Fun Girls."  Girls under the floor managers regime were encouraged to make as much money as possible by employing sexual favors, lewd acts, and other "after club" rendezvous. In exchange for allowing the activities to occur without objection, the girls had to give the Conducting Floor Manager Defendants a percent of their earnings ranging on average from 20-60% (the percentage increased with time and varied)—a pimp/prostitute arrangement.  By the beginning of 2013, this syndicate grew from one girl and one floor manager with an arrangement, to what became an integral part of The Cheetah's business operations.

36.

As the Conducting Floor Manager Defendants sought to increase their market share, attempts to recruit Ms. Valente into the crime syndicate came almost nightly. Fun Girls would often perform lewd and sexual acts in close proximity to her, the likes of which she strongly disapproved.  In each instance, Ms. Valente was very vocal to the one or more of the Conducting Supervisor Defendants about this fact.

Only on the rarest occasion would any of the Conducting Supervisor Defendants put a stop to the activity, or more likely move it to a more discreet area of the club so that the sexual or drug activity could continue.  However, on most occasions, the management would do nothing, and Ms. Valente was left to witness (in very close proximity) the Fun Girls performing sexual favors for customers, including oral sex, hand jobs, and vaginal and anal sex, and customers being allowed to put their fingers in vaginas and anuses.  In response, the Conducting Floor Manager Defendants would say things like:

- "Are you going to get on the team?";

- "Get out of this room, they want other girls, unless you are on the team";

- Manager Robert "Bob" Johnson would yell in Ms. Valente's face for not being a "team player"; and

- Floor manager Lee Tatum often asked dancer Lindsey, who Ms. Valente would work with on occasion, "Are you on our team or hers?"

As a top earner at The Cheetah, Ms. Valente was viewed as direct competition to the floor managers' underground regime, and it was made clear to her through repeated intimidation that they wanted her earnings and that she would have to participate in the illegal activities if she wanted to stay employed at The Cheetah.  Ms. Valente continually complained of the illegal activities to the Conducting Supervisor

Defendants, among others, and no corrective actions were taken.

37.

Upon information and belief, during this time period, Defendant Haley was hired by the Cheetah.  Haley was hired as a floor manager, but he quickly played a very active role in driving revenue for the cartel.

## FALL OF 2013

38.

As the crime syndicate's activity became more pervasive and inescapable, it became clear that the floor managers were not going to do anything about the activities and were now in fact actively promoting the activities, which are directly contrary to the job they are supposed to do for entertainers at the club.  Ms. Valente then raised the issues to her immediate superiors, including her "house moms."  The "house moms" also did nothing to stop the repeated attempts of the floor managers to get Ms. Valente to perform sexual favors for customers and to scream and yell at her when she would not comply.   In the fall of 2013, Ms. Valente formally approached the Head Floor Manager, Robert "Bob" Johnson.

39.

Ms. Valente had a meeting with management—Robert "Bob" Johnson—in

October 2013 without the mandatory presence of a "house mom."[3]  Haley was also present in the meeting.  Her direct supervisor and "house mom" was recorded on tape admitting to the occurrence of the meeting, which is not provided with this submission but will be submitted to the Court in the form of an audio recording.  *See* Recording of Heather Wood, where "house mom" Heather Wood speaks of this initial meeting and acknowledging that protocol was broken.

### EARLY 2014 TO JULY OF 2014

40.

After her formal meeting with Robert (Bob) Johnson in the Fall of 2013, things quickly deteriorated in to a campaign of physical, sexual, and verbal abuse against Ms. Valente.  For instance, the escalated harassment began immediately the evening of the formal meeting with Mr. Johnson and Haley.  After the meeting, Ms. Valente was called to a stage in a private area in the club where there were no customers at the time.  She stood there on stage and suddenly Haley stormed in.  He went back and forth to the bar and checking around the room, and ultimately came up to her, fists balled up, sweating, eyes bulging, and threatened, "Now you owe me. Now you owe me. Imma get it out of your a**."  At the time it was already rumored

---

[3] The Cheetah's policy had previously required that two people were present in any closed door meeting with a supervisor.  The third person was usually a "house mom."

around the club that Haley had assaulted women, in various private areas in the club, including the private area that Ms. Valente was currently in, that room being one of them. Needless to say, Ms. Valente was terrified. As soon as she could (when her set was over), she ran to the main room where there were ample people.

41.

This harassment continued for the next year, culminating in her first termination in September 2014 (see below for details).  Insofar as Haley and Robert Johnson were involved, they did things to Ms. Valente ranging from: yelling at her, shoving, posturing, intimidating, pinning her against the wall while screaming at her, all the way to blatant threats and daily terrorizing.  Ms. Valente had several meetings with The Cheetah and management about Haley' behavior to no avail.   More generally, her job was threatened nightly.   Her car was keyed.   Her hand was slammed in a door to one of the VIP rooms by one of the Conducting Floor Manager Defendants when she would not comply with sexual requests.   She was often screamed at inches from her face in front of customers.  On two separate occasions, she was drugged to near unconsciousness and was forced to stop working and rest in the break room.  On top of all of that, Ms. Valente was repeatedly intimidated by Conducting Floor Manager Defendants and Conducting Supervisor Defendants due to her noncompliance with sexual requests made of her.  Ms. Valente continued to

complain to Jack Braglia, Robert "Bob" Johnson, and Holly Wood, among other Conducting Floor Manager Defendants and Conducting Supervisor Defendants.

42.

The Cheetah was now a hostile environment for Ms. Valente (and others) due to its pervasive illegal activities.  For instance, Ms. Valente was regularly, sometimes forcefully, removed against her will from private dance rooms by Conducting Floor Manager Defendants who replaced her with Fun Girls (girls who perform illegal acts for the floor managers).  The expectations and requests that Ms. Valente perform sexual favors or otherwise demean herself sexually was now constant.  On occasion, Ms. Valente witnessed the owner of The Cheetah, Mr. William Hagood, groping girls against their will.  One specific time, he groped and fondled a girl with the stage name "Laney" in a lewd and violating manner.  Totally humiliated, Laney pulled away, gathered her work attire, and ran to the dressing room.  She later confided in Ms. Valente that because of his position as owner she endured the frightening act, and she felt taken advantage of, demeaned, violated, and saddened.

43.

As another example, Ms. Valente was regularly yelled at within an inch of her face by Robert "Bob" Johnson and Lee Tatum, often while backed against a wall as spit flew at her, and in such a threatening and irate fashion that she would be brought

to tears.  The intensity of the confrontations often caused such anxiety in Ms. Valente that she would have to go to the restroom immediately to relieve herself.   During those times, she would request permission from management to allow her to go home, but she was never allowed to leave—if she left she would be fired.   There were many similarly abusive occurrences, like when:

- Floor manager Ponish slammed Ms. Valente's hand in a VIP room door in effort to keep her from entering because she was known to refuse to comply with sexual request;

- Ms. Valente was told to "Shut the f*** up," by Lee Tatum (floor manager); and

- When a customer wanted Ms. Valente to behave like an Fun Girls (by performing sexual favors, allowing customers to touch and penetrate her, and performing lewd acts in front of customers) and she refused to do so, Robert "Bob" Johnson violently snatched her earnings from Ms. Valente's hand, gave it back to a customer, and told her to "Get the f*** out of here."

These are just a few specific examples.  Ms. Valente also witnessed Robert "Bob" Johnson, Lee Tatum, bouncer Haley, and other floor managers yell at other female employees, intimidate them, box them into corners, point in their faces, and spew vicious expletives on a routine basis if they refused to sexually submit to the customers.

44.

Moreover, The Cheetah sanctioned similar illegal and improper behavior by

customers toward Ms. Valente and others.  For instance, one customer repeatedly touched Ms. Valente's backside and between her legs, and she motioned floor manager Haley to come over to stop the activity, and after clearly seeing Ms. Valente, he did nothing about it.  Another time, Ms. Valente was in a VIP room with a customer who pulled his penis out.  When she told Lee Tatum (floor manager), again, Ms. Valente's request for intervention was ignored.  As yet another example, Ms. Valente witnessed "Tiana" getting smacked on her thighs and backside until she was black and blue.  When Ms. Valente and Tiana asked for the floor managers to come into their room and intervene, the floor managers failed to do so.

### AUGUST OF 2014

### 45.

After continuing to work, and continuing to notify The Cheetah's management of the illegal activities directed towards her—even in the fact of the terroristic actions designed to force Ms. Valente to quit—The Cheetah designed a scheme that they thought would allow them to get rid of her while appearing to do so for legitimate reasons.  The Cheetah accused Ms. Valente of having a "chargeback."  A "chargeback" is notification from a credit card company that the card to whom the card is issued disputed a particular charge on the card.

46.

In late August, The Cheetah attempted to use the ruse of an alleged chargeback as a reason for firing Ms. Valente.  The Cheetah alleged that Ms. Valente had a chargeback on Saturday, August 23, 2014.  Under normal circumstances, The Cheetah, upon information and belief, handles all chargeback issues and does its best to refute and correct any chargebacks.  However, The Cheetah did not do any diligence with respect to this chargeback, and this immediately raised the suspicions of Ms. Valente.  As a result, Ms. Valente immediately inquired about who made the alleged chargeback and called that client to inquire about the situation.  As it turned out, there were not in fact any issues—the charges were legitimate and the client conveyed the same to Ms. Valente and The Cheetah.  Attached as Exhibit A to this response is the correspondence from Ms. Valente to Mr. Braglia (General Manger and of The Cheetah), dated September 5, 2014, which outlines The Cheetah's conduct with respect to Ms. Valente's initial termination from being an "employee." This termination was later withdrawn when Ms. Valente proved that the alleged chargeback never in fact happened.

## THE DRUGGING OF MS. VALENTE

47.

In early October of 2014, Ms. Valente was working at The Cheetah and was

overcome with dizziness, drowsiness, and eventually severely incapacitated during a VIP session. Ms. Valente has very little memory of the event but remembers a feeling of humiliation and feeling dirty. She somehow made it home in her own vehicle, and the Cheetah breathalyzer log indicates that she was not intoxicated when she left that evening. When she got home, her boyfriend was extremely upset at her condition and insisted they go to the hospital, and he took her to the hospital, where she was given an IV and eventually sent home when she was stabilized. Ms. Valente had been administered gamma-hydroxybutyric acid (GHB) (or similar drug) by the Enterprise though the Means of Operation.

48.

Ms. Valente had several other instances where this type of experience had occurred at The Cheetah, but it was not until she had a boyfriend that somebody was there to care for her after her shift and could determine her condition and seek medical help. After being made aware of the situation from the hospital visit and her boyfriend, she was awakened to the darker happenings of the club. For instance, on another evening shortly after the drugging night, Ms. Valente was with a high-net worth individual. Ms. Valente and her client were sitting in The Den (VIP area in Main Room) after the client had survived a vigorous attempt by a Floor Manager trying to sell him on the Menu, in which the customer told Ms. Valente he had no

interest.  Ms. Valente ordered a martini.  One of the waitresses brought it.   When it arrived, it was room temperature (not chilled as usual).  Not thinking much of it, Ms. Valente took a sip and set the drink down. Within a few moments, she felt extremely out-of-sorts, and she sent the drink back.  Shortly thereafter, the head Floor Manager, Bob Johnson, pulled her aside and advanced toward her until she was backed against a wall.  He screamed in her face in such close proximity that his nose and forehead nearly touched hers, and his finger was thrusting and jabbing toward her eye.  His complaint?  She sent a drink back.  He screamed that Ms. Valente was "costing him money."   Ms. Valente was again the victim of the Enterprise and its Means of Operation and given gamma-hydroxybutyric acid (GHB) (or similar drug).

49.

Although it can be difficult to avoid drinking in an adult entertainment environment, after enduring a myriad of abusive attacks by Bob Johnson and the other Conducting Floor Manager Defendants and Conducting Supervisor Defendants, Ms. Valente made a conscious effort to be even more mindful about drinking anything. She felt a high amount of anxiety and fear while at work. Also, she began noticing lasting effects of drinking while at work, and she noticed that days after a shift were a lot harsher on her than they were in the past.  She really felt the effects of drinking after having even the smallest amount of alcohol—amounts

(like two sips of a Martini) that normally wouldn't have any effect on her—which suddenly caused her to feel out-of-sorts, have difficulty focusing, feel a loss of control, experiencing blotchy vision, and have memory loss for blocks of time.

50.

On an occasion after having only two drinks, she recalls feeling extremely out-of-sorts while sitting with a customer.  Ms. Valente excused herself to go to the restroom.  She tried to throw up.  She also ordered a coffee, chugged water, and did what she could to regain control. Another time, she was struggling to remain cognizant and aware while sitting with a customer.  Ms. Wood then came around the corner and shouted, "Ahahahaa! Monique,[4] you're hooking up with a customer." The customer hastily left soon after her comments. When she walked by the VIP Room entrance on her way out of the area, Floor Manager Guy Robinson made kissing noises at her and also implied that she performed lewd acts with this customer, an event of which she has zero recollection, has never to her knowledge done, and would never do. (After interviewing many girls with similar stories, it is clear that the Enterprise would try to convince girls that they willingly participated in lewd acts even when they were not the type to engage in prostitution and would

---

[4] "Monique" was Ms. Valente's stage name at The Cheetah.

never do so in sound mind).  Ms. Valente had again been administered gamma-hydroxybutyric acid (GHB) (or similar drug) by the Enterprise through the Means of Operation.

51.

On nights when she suspected foul play, she breathalyzed (as is required at the end of the evening), and she registered nearly no alcohol on the test.  Despite this, she would struggle driving home, sometimes pulling over to regroup and regain composure. And upon arriving home after those nights, she would have emotional fits, bouts of crying, yelling, aggression, sadness, confusion, memory loss, and depression.  After bringing her complaints to the Conducting Supervisor Defendants time and time again seeking help, nothing changed for the better. In fact, things worsened as she became a marked woman. From that point, things continued to further cascade into the hostile, abusive, and dangerous environment described herein.  She now saw what was happening—the Enterprise was drugging girls that did not submit to prostitution so that the Enterprise could profit from their bodies with or without their consent–the "Bill Cosby Special."  Thankfully, given her prior experiences, hospital visit, and new awareness, she avoided the dire consequences of this Menu item after her hospital visit.  However, this much cannot be said of others.

## THE PATTERN OF OVERSERVING, DRUGGING AND SEXUAL ASSAULT OF OTHER ENTERTAINERS

### 52.

These experiences are shared by more than just Ms. Valente.  Many other entertainers have reported similar incidents of being administered gamma-hydroxybutyric acid (GHB) (or similar drug) and/or other illegal drugs by the Enterprise though the Means of Operation, and they are willing and prepared to testify to the same.  For purposes of the allegations in this Verified Complaint, the exemplary experiences of three other entertainers are detailed.  To protect the safety and identify of these witnesses, they will be referred to as Jane Doe X.

### 53.

Jane Doe Witness 1 was drugged by a Directing Floor Manger Defendant and Directing Waitress Defendant while in a VIP Room.  After she was sexually assaulted by the customer, she crawled out of the room, not entirely coherent, and was intercepted by Heather Wood, who proceeded to humiliate her by teasing her and trying to convince her that she had willingly "crossed the line" with a customer (as noted before, it is clear that the Conducting Supervisor Defendants would try to convince girls that they willingly participated in the lewd acts).  Defendant Wood was making fun of her, saying that Jane Doe Witness 1 was performing lewd acts

with the customer. As noted above, this is the exact reaction Defendant Wood had to Ms. Valente after one of the instances of her drugging. Defendant Wood ushered Jane Doe Witness 1 out of the club, and threw her in a cab. Jane Doe Witness 1 woke up on her front lawn the following morning.

54.

Jane Doe Witness 2 was raped by the first assistant to a city official (said official was present at the club that evening, though not in the room where the event happened).  After the assault, she ran out of the VIP area, barefoot and shoes in hand and sought safety from Conducting Manager Defendant Kim. Defendant Kim took her in the back room and gave Jane Doe Witness 2 a substantial amount of tequila shots, and Kim ingested a substantial amount herself.  After giving Jane Doe Witness the shots, Defendant Kim took her to the Penthouse with some high-net worth customers and was given more alcohol and illegal drugs. Jane Doe Witness 2 has no memory of what happened afterwards, and her only memory after that was Defendant Kim frantically hurrying her out of the private Penthouse exit out of the club.  Jane Doe Witness 2 was drugged so often, and for so long, that when she for the first time tried using illegal drugs of her own volition one evening, to her surprise, she already had an extremely high-tolerance built up and was well aware of the feeling that the drug caused.

55.

Jane Doe Witness 3 was sexually penetrated by a customer against her will. Although she was almost incapacitated, she made him stop and left the room. When Jane Doe Witness 3 told one of the Conducting Floor Manager Defendants, he made her return the money the customer paid for her time. Another time, a customer paid the staff $200 to leave Jane Doe Witness alone in a VIP Room to make sure they were not disturbed.  The customer forced himself on her and forced cocaine in her mouth. Jane Doe Witness 3 started screaming, upon which time the customer left and she was left alone in the room to continue to scream.  None of the Conducting Floor Manager Defendants or Conducting Supervisor Defendants responded in any way or did anything when they were made aware of the happening.

56.

Jane Doe Witness 4 was nearly raped in the executive lounge of The Cheetah Lounge and reported the attempted rape to Defendants Johnson and P. Johnson. Instead of helping her, Defendant Johnson told her that if she spoke up about it, he would make her life hell inside and outside of the club.  Defendant Haley also used to fondle her without her consent.  She was also drugged while in the club and her daughter, who also worked there, was also drugged and Jane Doe Witness 4 had to pick up her daughter (who was nearly unconscious) from the club.

57.

Jane Doe Witness 5 was sexually assaulted many times by Defendant Hagood. He would attempt and complete penetrating her vagina with his fingers and sucked and bit on her nipples regularly in the middle of The Cheetah.   She was also drugged and then later raped by a customer in the executive room.

58.

Jane Doe Witness 6 was groped by a Cheetah employee in a room off of the Executive Room.   She was also approached Defendant Lee and Hayes to join the "team," and she at first declined.  She later realized that the only way to make money at The Cheetah Long was to join the "team" and went to Defendant Lee to take him up on his offer.   Upon joining the "team," she was pressured to prostitute herself by the Conducting Floor Managers and did regularly prostitute herself.

59.

Jane Doe Witness 7 was forced to regularly engage in prostitution by Defendants Holcomb, Tatum, and P. Johnson.  When she would get in situations where she was physically assaulted, including being pinned down and grabbed, or if she saw elicit activity going on, if she told the Conducting Floor Manager Defendants or the Conducting Supervisor Defendants, they would do nothing and sometimes she would be forced to give tips back to the customer if they were not

"satisfied."  When Jane Doe Witness 7 would tell Defendant Johnson specifically about events that she did not want to participate in, he would tell her that she cannot keep putting him in situations like that—his message was, as long as she got paid, it did not matter.  In 2010, Jane Doe Witness 7 was also sexually assaulted by Defendant Hagood, who was told to go to the Executive Room because the owner wanted to see her, and he proceeded to suck on her nipples.

60.

At least Defendant Johnson and the Conducting Floor Managers were made aware and/or had knowledge of many of these events, along with many other similar actions engaged in by Defendant Haley, and neither Defendant Johnson nor the other Conducting Floor Manager Defendants Conducting Supervisor Defendants did anything about it for years.  Additionally, and again upon information and belief, one of the entertainers at The Cheetah overdosed in the club due to the Enterprise and administration of too high an amount of illegal drugs.[5]

**THE PENTHOUSE NIGHT**

61.

On February 24, 2015, Ms. Valente was in the executive lounge with four

---

[5] Discovery and further investigation should confirm this, but Plaintiff does not have definitive evidence at this junction.

customers and three other dancers (the "Penthouse Night").   Soon after the customers received their first round of drinks, two of the girls began grinding on two of the customers and allowing them to touch their breasts and vaginas.  Ms. Valente immediately complained to Defendant Tatum, who then seethed through his teeth "Shut the f*** up. Shut the f*** up, Monique."

62.

The group was then moved into the Penthouse, which is the most private room in the club. There, the two dancers immediately began performing acts that completely disgusted Ms. Valente.  She was absolutely mortified, and afraid for her well-being.  Things quickly escalated to the point where one "Fun Girl" was being fingered in her vagina while she grinded her body on the customer.  On the chair on the other side of Ms. Valente, another Fun Girl was receiving oral sex.  A dancer with the stage name "Veronica" was involved. The environment was terrifying and absolutely out of control.  The male workers at The Cheetah were never subjected to any such conduct or treatment, and certainly the Hypothetical Gender Neutral Dancer (defined in Paragraph 84) was not to be afforded any such treatment.

63.

Ms. Valente's customer became provoked by the sexual activity happening a few feet away and then indicated that he wanted similar treatment.  This made it

incredibly difficult to maintain the professional atmosphere that Ms. Valente typically maintained between herself and her clients.  The only thing Ms. Valente could think to do to diffuse the situation was to go to the restroom to catch her breath and try to pass the time.  Ms. Valente considered quitting and walking out of the building, but also reminded herself that she needed her job to survive, and felt that she should not be forced to give up her job because she refused to endure a sexually hostile work environment/abuse and abuse due to her gender.

64.

Valente made the decision, as she had so many times before, to immediately inform her supervisors, Defendants Johnson and Tatum, of the situation and to complain about the sexual harassment, hostile work environment, and gender discrimination.  Moreover, she stayed after her shift for an extra thirty minutes, to specifically speak to her direct supervisor, Defendant Overturf, because her complaints had fallen on deaf ears with the others, including Defendants Robert "Bob" Johnson and Jack Braglia on prior occasions, some of which are documented above.  Ms. Valente followed Defendant Overturf around for over 30 minutes going over the details of the incident, including giving her the girls' names who were involved, and explaining the sexual harassment, hostile work environment, and gender discrimination.  *See* Recording of Heather Overturf, which Ms. Valente will

be happy to provide to the Court, and which documents Ms. Overturf talking about the 30 minute meeting with "Monique," which is Ms. Valente's stage name, on the night of the "snowstorm" in Atlanta—which was February 24, 2015;[6] *see also,* Recording of Heather Overturf, which Ms. Valente will be happy to provide to the Court, and which is a recording of Ms. Wood listing the girls that Ms. Valente told her were there that night in the Penthouse.   Ms. Valente could tell from Ms. Overturf's reaction that she knew Ms. Valente was extremely upset, and Ms. Overturf coaxed Ms. Valente into relaxing and convinced her to return to work the next day and to pretend nothing happened.   That evening, Ms. Valente went home and was so shaken she could barely put together a coherent sentence.   She cried hysterically to her boyfriend, describing the night's occurrence.

65.

*Ms. Valente was fired when she walked into work the next day, February 25, 2015. See* Email from A. Valente to J. Braglia, dated March 1, 2015, attached as Exhibit B.  Ms. Valente was told she had a chargeback on February 12, 2015, in the amount of $580.  *Id.*  However, The Cheetah refused to tell her who made the

---

[6]  *See*  http://www.wsbtv.com/news/news/local/snow-falling-north-georgia-metro-atlanta-see-dusti/nkHcQ/ (confirming that the night of the snowstorm was February 24, 2015, which is the Penthouse Night).

chargeback.  Additionally, The Cheetah refused to give her any details about the alleged chargeback whatsoever.  *Id.*  Obviously, The Cheetah did not want to give Ms. Valente the opportunity to prove that there was no chargeback.  She was ***really*** fired for complaining about the illegal activities.

66.

Ms. Valente conveyed this information to Defendant Jack Braglia, club owner and manager on March 1, 2015.  *Id.*  Ms. Valente requested to return to her job and requested that the illegal behavior cease.  *Id.*  The Cheetah refused to allow her to come back to work, and told her to sue them if she wanted and wished her good luck in doing so.

## <u>COUNT I</u>
## VIOLATIONS OF RICO, 18 U.S.C. §1962 (c)

67.

Plaintiff Valente, realleges and incorporates herein by reference each of the allegations contained in the preceding paragraphs of this Complaint.

68.

Conducting Supervisor Defendants, Conducting Floor Manager Defendants, Directing Payment Processors,, Trac-Eric, and National Limousine are each "persons" as that term is defined in 18 U.S.C. §1961(3).

Pursuant to 18 U.S.C. § 1962:

> It shall be unlawful for any person who had received any income derived directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt . . . to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the of which affect, interstate or foreign commerce.

69.

At all relevant times, the Defendants each conducted the affairs of the association-in-fact Enterprise identified herein, the affairs of which affected interstate commerce through a pattern of racketeering activity.

## A.   THE ENTERPRISE ALLEGATIONS

70.

Plaintiffs allege in the aggregate, one association-in-fact enterprise, the Enterprise, operated by Defendants.

### 1.   The Enterprise

71.

For purposes of this claim, the RICO "enterprise" (Enterprise) is an association-in-fact consisting of:  The various Defendants, including The Cheetah, the Conducting Supervisor Defendants, the Conducting Floor Manager Defendants, the Identified Personnel, National Limousine, and Trac-Eric. As noted above, these

persons comprise the Enterprise with a *modus operandi* described in Paragraphs 9-15, and each Defendant knew of or clearly and willfully ignored the illegality of the Enterprise and played a part in directing/conducting the affairs of the Enterprise (*e.g.,* the Means of Operation).

>    **2.    Each Enterprise Member Had a Shared Purpose in The Success of the Enterprise and Its Wire and Mail Fraud, Illegal Drug Sales and Distribution, and Illegal Drugging.**

72.

The Enterprise includes The Cheetah, Hagood, and Braglia in and of the Enterprise (as identified above) who knowingly provided funds to finance all or part of the Enterprise of the Defendants. By virtue of the investments and financing, the scheme of the Defendants was able to continue, to flourish and to grow.  The investments made by The Cheetah, Hagood, and Braglia provided the Defendants with credibility and legitimacy through the provision of a decadent atmosphere and alcohol, which allowed and allows them to attract more entertainers to become conspirators, grow their drug sale and distributions cartel, and to attract high-net worth individuals as customers into the scheme and allowed the Enterprise to operate.  The Cheetah, Hagood, and Braglia had and have a systematic linkage to the Enterprise because of the contractual relationship, financial ties and coordination of activities, as well as numerous meetings, ongoing communications, and the

conducting of due diligence on the part of The Cheetah, Hagood, and Braglia, such that they conducted/directed the infrastructure of the Enterprise, and did know or clearly and willfully ignored that the other Defendants were conducting an ongoing illegal operation and that representations otherwise were false and fraudulent. Despite this, The Cheetah, Hagood, and Braglia joined together with the Defendants to conduct the Enterprise for the shared purpose of earning revenues through the illegal operations, which include a pattern of sexual abuse, harassment, drug distribution and sale, attempted rape, racketeering, and illegal drugging.    At all relevant times, each of The Cheetah, Hagood, and Braglia were a knowing participant in that Enterprise, profited from the scheme and was aware of the involvement of other Defendants.

73.

Trac-Eric is the holding company for the land upon which The Cheetah Lounge and its parking lot reside, and one of the central points the Enterprise uses to conduct all or part of the illegal Enterprise of Defendants (as identified above). Trac-Eric provided and provides a lease in favor of The Cheetah and provides the Enterprise and other Defendants with credibility and legitimacy by leasing The Cheetah and/or the Enterprise a prime piece of real estate and ability to provide high-end food and beverages, which allowed and allows them to attract more unknowing

new entertainers and high-net worth customers.   Trac-Eric has had and continues to have a systematic linkage to the Enterprise because of the contractual relationship, financial ties and coordination of activities, as well as numerous meetings and the conducting of due diligence on the part of the Trac-Eric with respect to The Cheetah and Hagood, such that it knew or clearly and willfully ignored that the Defendants were conducting an ongoing illegal operation.  Despite this, the Directing Payment Processors joined together with the Defendants to conduct the Enterprise for the shared purpose of earning revenues through the illegal operations, which include a pattern of sexual abuse, harassment, drug distribution and sale, attempted rape, racketeering, and illegal drugging.   At all relevant times, Trac-Eric was aware of the Defendants scheme and was a knowing participant in that Enterprise, profited from the scheme and was aware of the involvement of the Conducing Manager Defendants in the scheme.

74.

National Limousine, the driver and limousine service, is one of the channels of distribution for directing/conducting the transfer of drugs from outside The Cheetah Lounge into The Cheetah Lounge from high-net worth customers to Defendants herein and received substantial funds for facilitating all or part of the illegal Enterprise of Defendants (as identified above).   National Limousine has

provided and continues to provide the Defendants with the credibility and legitimacy in providing high end driver services and illegal drugs, which allowed them to attract more unknowing new entertainers and high-net worth customers by providing a low-risk corridor in which to traffic illegal drugs into The Cheetah Lounge.  National Limousine had and has a systematic linkage to the Enterprise because of the contractual relationship with The Cheetah, the acquisition of its limousine from The Cheetah, financial ties, and coordination of activities, as well as numerous meetings between it and the Directing Manager Defendants such that National Limousine knew or clearly and willfully ignored that the Defendants were conducting an ongoing illegal operation.  Despite this, National Limousine joined together with the Defendants to conduct the Enterprise for the shared purpose of earning revenues through the illegal operations, which include a pattern of sexual abuse, harassment, drug distribution and sale, attempted rape, racketeering, and illegal drugging.  At all relevant times, National Limousine was aware of the Defendants scheme and was a knowing participant in that Enterprise, profited from the scheme and was aware of the involvement of the Conducing Manager Defendants, Identified Personnel, and the Conducting Floor Manager Defendants in the scheme.

75.

The Conducting Floor Manager Defendants includes the floor managers who

directed/conducted and direct/conduct security of the Enterprise, offered and offer the Menu to customers, and directed/conducted, direct/conduct, and/or oversee the transfer of illegal drugs from National Limousine, among other channels, and by and through the Identified Personnel, among other persons, to high-net worth customers, conspirators, including certain Identified Personnel, and/or unsuspecting entertainers (in the case that the "Bill Cosby Special" was ordered by a customer), and had received and continues to receive substantial funds for facilitating all or part of the illegal Enterprise of Defendants (as identified above).  The Conducting Floor Manager Defendants have provided and continue to provide the Defendants with supervision of the underground distribution channel within The Cheetah Lounge for the sale and delivery of illegal drugs and also provide security to the Enterprise to ensure that the high-net worth customers could participate in illegal goods and services without concern for law enforcement or otherwise being exposed, which allowed and allows the Enterprise to attract more high-net worth customers.   The Conducting Floor Manager Defendants have had and continue to have a systematic linkage to the Enterprise because of the contractual relationship, financial ties and coordination of activities, as well as numerous meetings with Conducting Supervisor Defendants, National Limousine, and Identified Personnel such that they knew or clearly and willfully ignored that the Defendants were conducting an ongoing illegal

operation.  Despite this, the Conducting Floor Manager Defendants joined together with the Defendants to conduct the Enterprise for the shared purpose of earning revenues through the illegal operations, which include a pattern of sexual abuse, harassment, drug distribution and sale, attempted rape, racketeering, and illegal drugging.  At all relevant times, each of the Conducting Floor Manager Defendants were aware of the Defendants' scheme and was a knowing participants in that Enterprise, profited from the scheme and was aware of the involvement of the other Defendants in the scheme.

76.

The Conducting Supervisor Defendants includes the managers that directed/conducted and direct/conduct the overall affairs of the entirety of the Enterprise, including provision of security and the Menu from Conducting Floor Manager Defendants, provision of the illegal drugs through the Identified Personnel channels, provision of the drugs entering The Cheetah Lounge through National Limousine, provision of rooms and land and property from Defendant Trac-Eric for the lewd activities and drug activities to occur, securing of investment funds from Defendants Bill Hagood and Jack Braglia, and contracting for payment processing services from for Cheetah Bucks and driving the supply of high-net worth customers, conspirators, including certain Identified Personnel, and/or unsuspecting

entertainers (in the case that the "Bill Cosby Special" was ordered by a customer), and received substantial funds for facilitating all or part of the illegal Enterprise of Defendants (as identified above).   The Conducting Supervisor Defendants have provided and continued to provide the Defendants with supervision of the underground distribution channel within The Cheetah Lounge for the sale and delivery of illegal drugs and illegal services, including security, the Menu, illegal drugs, rooms and land and property, investment funds, and payment processing services.  The Conducting Supervisor Defendants had and have a systematic linkage to the Enterprise because of the contractual relationship, financial ties and coordination of activities, as well as numerous meetings with Conducting Floor Manager Defendants, Identified Personnel, National Limousine, and Trac-Eric, such that they knew or clearly and willfully ignored that the Defendants were conducting an ongoing illegal operation.  Despite this, the Conducting Supervisor Defendants joined together with the Defendants to conduct the Enterprise for the shared purpose of earning revenues through the illegal operations, which include a pattern of sexual abuse, assault, harassment, drug distribution and sale, attempted rape, racketeering, and illegal drugging.   At all relevant times, each of the Conducting Supervisor Defendants were aware of the Defendants scheme and was a knowing participant in that Enterprise, profited from the scheme and was aware of the involvement of the

other Defendants in the scheme.

77.

The Identified Personnel were the delivery point for the sale, possession, and distribution of the illegal drug and conduct the affairs of the enterprise and have a systematic linkage with the Enterprise due to their contractual relationship for their employ with The Cheetah and knew or clearly and willfully ignored that the Defendants were conducting an ongoing illegal operation

**B.    The Racketeering Activity and Pattern of Racketeering**

78.

"Racketeering activity" means, among other enumerated activity, to commit, to attempt to commit, or to solicit, coerce, or intimidate another person to commit, 18 U.S.C. §1341, relating to mail fraud, 18 U.S.C. §1343, relating to wire fraud and 21 U.S. Code § 841, relating to dispensing, possession, and distributions of illegal drugs (and to women without their consent and with intent to rape). 18 U.S. Code § 1961(1).

**3.    Defendants' Use Of The Mails And Wires**

79.

Each of the Conducting Supervisor Defendants, Conducting Floor Manager Defendants, and The Cheetah engaged in and affected interstate commerce because

they engage in the following activities across state boundaries through use of the mails and wires:  The sale, purchase and administration of the financing and receipt of revenues to run and support the Enterprise's illegal activities by Defendants herein; and/or the transmission and/or receipt of sales and marketing literature, including The Cheetah Newsletter, which is sent via email, and its website, which targets out of town "conventioneers" and "businessmen"; and/or transmission and/or receipt of invoices, statements and payments related to the operations of Defendants and the Enterprise.  The use of interstate and international mail and wire was for the purposes of obtaining money or property by means of omissions, false pretenses and misrepresentations.

### 4.    The Predicate Acts Of Wire Fraud, Mail Fraud, Illegal Drug Sales and Distribution, and Illegal Drugging with Intent to Rape

Pursuant to 18 U.S. Code § 1961,
          As used in this chapter—

(1) "racketeering activity" means (A) any act or threat involving murder, kidnapping, gambling, arson, robbery, bribery, extortion, dealing in obscene matter, ***or dealing in a controlled substance or listed chemical (as defined in section 102 of the Controlled Substances Act)***, which is chargeable under State law and punishable by imprisonment for more than one year;

                    *          *          *

***section 1341 (relating to mail fraud), section 1343 (relating to wire fraud)***, section 1344 (relating to financial institution fraud),

18 U.S. Code § 1961(1) (emphasis added). "State" in the context of the statute means any State of the United States under 18 U.S.C. §1955(b)(6).

### a. Wire Fraud and/or Mail Fraud
80.

The Defendants' fraudulent and wrongful practices, illegal conduct and violations of RICO comprised of the Enterprise were carried out by an array of conspirators, including Identified Personnel, and customers, traveling across state boundaries, and the Defendants necessarily relied upon interstate travel and information, products (credit card processing) and funds by the U.S. mails and/or interstate wire facilities. Additionally, the Enterprise via The Cheetah directly markets to sport games, conventions, and other events, offering reduced entry fees to those customers that prove affiliation with these events, which are heavily attended by out-of-state persons. *See* https://www.thecheetah.com/about/ (soliciting "conventioneers"); *see also,* https://www.thecheetah.com/about/faq/ (recommending hotels for out-of-towners).

81.

The nature and pervasiveness of the Defendants Enterprise, which is orchestrated out of The Cheetah Lounge, necessarily required communication

directly and frequently by the U.S. mails and/or interstate wire facilities with customers with respect to chargeback issues, credit card charges, credit card issues, travel arrangements via National Limousine, and other payment and services related accommodations and issues.

82.

In addition, Defendants entire Enterprise was and is conducted with its need to communicate and interact with its respective out of state customer base, and by its very nature therefore, engaged in wire communications which were false, fraudulent and illegal.

83.

Many of the precise dates of the Defendants' uses of the U.S. mails and interstate wire facilities (and corresponding RICO predicate acts of mail and wire fraud) have been hidden and cannot be alleged without access to the Defendants' books and records. Indeed, an essential part of the successful operations of the illegal scheme and/or the unlawful misrepresentations that such operations were legally being conducted as a gentleman's club, depended upon secrecy, and in fact Defendants' took deliberate steps to conceal their wrongdoing.  However, Plaintiffs can generally describe the occasions on which the RICO predicates acts of mail and wire fraud occurred, and how those acts were in furtherance of the Defendants illegal

Enterprise.

84.

For instance, each of the customers described in Paragraphs 54-58 were out-of-state customers that traveled to The Cheetah Lounge.  Each of these customers were marketed to and targeted by the Enterprise through interstate commerce, used interstate commerce to arrive at The Cheetah Lounge, and each had out-of-state credit cards that were processed and transactions finalized via interstate wire facilities, including by conversion of that credit to Cheetah Bucks.  Additionally, the "Cheetah Newsletter" is distributed via interstate wire facilities and The Cheetah generally markets to out-of-towners via its website so they visit The Cheetah Lounge during their stay in Atlanta.  *See* https://www.thecheetah.com/about/ (soliciting "conventioneers"); *see also,* https://www.thecheetah.com/about/faq/ (recommending hotels for out-of-towners).

85.

Each act of mail fraud and wire fraud as aforementioned constituted a violation of 18 U.S.C. §1341 relating to mail fraud and 18 U.S.C. §1343 relating to wire fraud, and such were each engaged in two or more times.

### b. Illegal Drug Sales and Distribution, and Illegal Drugging with Intent to Rape

In addition, by carrying on illegal Enterprise, Defendants have engaged in predicate acts comprised of illegal drug sales, illegal drug trafficking, dealing in a controlled substance or listed chemical (as defined in section 102 of the Controlled Substances Act, including ketamine [Schedule III], gamma-hydroxybutyric acid (GHB) [Schedule 1], and/or cocaine [Schedule II], thereby violating federal and state drug laws.

The Defendants all committed predicate acts under RICO, in violation of 21 U.S. Code § 841, which provides in relevant part:

> (a) **UNLAWFUL ACTS**.  Except as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally—
>
> (1) to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance; or
>
> (b) **PENALTIES**.  Except as otherwise provided in section 849, 859, 860, or 861 of this title, any person who violates subsection (a) of this section shall be sentenced as follows:
>
> *          *          *
>
> (C) *In the case of a controlled substance in schedule I or II, gamma hydroxybutyric acid* (including when scheduled as an approved drug product for purposes of section 3(a)(1)(B) of the Hillory J. Farias and Samantha Reid Date-Rape Drug Prohibition Act of 2000), or 1 gram of flunitrazepam, except as provided in subparagraphs (A), (B), and (D), *such person shall be sentenced to a term of imprisonment of not more than 20 years and if death or serious bodily injury results from the use of such substance shall be sentenced to a term of imprisonment of not*

*less than twenty years or more than life, a fine not to exceed the greater of that authorized in accordance with the provisions of title 18 or $1,000,000 if the defendant is an individual or $5,000,000 if the defendant is other than an individual, or both*. If any person commits such a violation after a prior conviction for a felony drug offense has become final, such person shall be sentenced to a term of imprisonment of not more than 30 years and if death or serious bodily injury results from the use of such substance shall be sentenced to life imprisonment, a fine not to exceed the greater of twice that authorized in accordance with the provisions of title 18 or $2,000,000 if the defendant is an individual or $10,000,000 if the defendant is other than an individual, or both. Notwithstanding section 3583 of title 18, any sentence imposing a term of imprisonment under this paragraph shall, in the absence of such a prior conviction, impose a term of supervised release of at least 3 years in addition to such term of imprisonment and shall, if there was such a prior conviction, impose a term of supervised release of at least 6 years in addition to such term of imprisonment. Notwithstanding any other provision of law, the court shall not place on probation or suspend the sentence of any person sentenced under the provisions of this subparagraph which provide for a mandatory term of imprisonment if death or serious bodily injury results, nor shall a person so sentenced be eligible for parole during the term of such a sentence.

*          *          *

(7) Penalties for distribution.—

    (A)In general.—

        Whoever, with intent to commit a crime of violence, as defined in section 16 of title 18 (*including rape*), against an individual, violates subsection (a) by distributing a controlled substance or controlled substance analogue to that individual without that individual's knowledge, *shall be imprisoned not more than 20 years and fined in accordance with title 18*.

(B)Definition.—

> For purposes of this paragraph, the term "without that individual's knowledge" means that the individual is unaware that a substance with the ability to alter that individual's ability to appraise conduct or to decline participation in or communicate unwillingness to participate in conduct is administered to the individual.

21 U.S. Code § 841(emphasis added).

86.

Defendants and Identified Personnel dealt in a controlled substance and/or listed chemical (as defined in section 102 of the Controlled Substances Act because they meet the elements of 21 U.S. Code § 841 by distributing, dispensing, and possessing illegal drugs (including gamma-hydroxybutyric acid (GHB), ketamine, and/or cocaine) and with intent to distribute to customers and conspirators, including Identified Personnel, and dispensing those illegal drugs to, among others, Ms. Valente, without their knowledge, without their (her) knowledge and with intent to commit a crime of rape against them (Ms. Valente) as described above, two or more times.

87.

Defendants also violated Georgia law.  O.C.G.A. 16-13-30 (2010) provides:

**16-13-30**.  Purchase, possession, manufacture, distribution, or sale of controlled substances or marijuana; penalties

(a) Except as authorized by this article, it is unlawful for any person to purchase, possess, or have under his control any controlled substance.

(b) Except as authorized by this article, it is unlawful for any person to manufacture, deliver, distribute, dispense, administer, sell, or possess with intent to distribute any controlled substance.

(c) Except as otherwise provided, any person who violates subsection (a) of this Code section with respect to a controlled substance in Schedule I or a narcotic drug in Schedule II shall be guilty of a felony and, upon conviction thereof, shall be punished by imprisonment for not less than two years nor more than 15 years. Upon conviction of a second or subsequent offense, he shall be imprisoned for not less than five years nor more than 30 years.

(d) Except as otherwise provided, any person who violates subsection (b) of this Code section with respect to a controlled substance in Schedule I or Schedule II shall be guilty of a felony and, upon conviction thereof, shall be punished by imprisonment for not less than five years nor more than 30 years. Upon conviction of a second or subsequent offense, he or she shall be imprisoned for not less than ten years nor more than 40 years or life imprisonment. The provisions of subsection (a) of Code Section 17-10-7 shall not apply to a sentence imposed for a second such offense; provided, however, that the remaining provisions of Code Section 17-10-7 shall apply for any subsequent offense.

(e) Any person who violates subsection (a) of this Code section with respect to a controlled substance in Schedule II, other than a narcotic drug, shall be guilty of a felony and, upon conviction thereof, shall be punished by imprisonment for not less than two years nor more than 15 years. Upon conviction of a second or subsequent offense, he shall be punished by imprisonment for not less than five years nor more than 30 years.

Defendants and Identified Personnel dealt in a controlled substance and/or listed chemical (as defined in section 102 of the Controlled Substances Act because they meet the elements of 21 U.S. Code § 841 by distributing, dispensing, and possessing illegal drugs (including gamma-hydroxybutyric acid (GHB), ketamine, and/or cocaine) and with intent to distribute to customers and conspirators, including certain Identified Personnel, and dispensing those illegal drugs to, among others, Ms. Valente, without their (her) knowledge and with intent to commit (or facilitate the commission of) the crime of rape against them (Ms. Valente) as described above, two or more times.

### 5.    The Conduct Of The Rico Enterprise Affairs' And Rico Conspiracy
88.

Each of the Defendants have exerted control over their respective Enterprises and in violation of Section 1962 (c) of the RICO statute, have conducted or directed the affairs of the RICO enterprise directly or indirectly as described above.

### 6.    Pattern Of Racketeering Activity Through Predicate Acts Of Wire Fraud, Mail Fraud, Illegal Drug Sales and Distribution, and Illegal Drugging with Intent to Rape

89.

Defendants The Cheetah, the Conducting Supervisor Defendants, Conducting Floor Manager Defendants, Identified Personnel, Trac-Eric, and National Limousine have conducted and directed the affairs of the Enterprise through a pattern of racketeering activity as noted above, including acts that are indictable under 18 U.S.C. §1341, relating to mail fraud, 18 U.S.C. §1343, relating to wire fraud and 21 U.S. Code § 841, relating to dispensing, possession, and distributions of illegal drugs (and to women without their consent and with intent to rape) and O.C.G.A. 16-13-30, relating to dispensing, possession, and distribution of illegal drugs, each of which was engaged in two or more times.  These acts occurred within four years of this Complaint being filed.

90.

The Defendants' pattern of racketeering likely involved hundreds if not thousands of separate instances of the use of the internet and wires and use of the U.S. mails in furtherance of the enterprise and scheme, and hundreds if not thousands of violations of 21 U.S. Code § 841 and O.C.G.A. 16-13-30 by the Enterprise, and these violations described in this Complaint will continue to occur if the Enterprise is not stopped.

91.

These fraudulent interstate wire transmissions constitute "racketeering

activity" within the meaning of 18 U.S.C. Sec. 1961(1). Collectively these violations constitute a "pattern of racketeering" within the meaning of 18 U.S.C. §1961(5) in which the Defendants intended to defraud Ms. Valente of legitimate earnings (as above) by luring persons into The Cheetah Lounge and fraudulently and illegally offering the Menu good and services instead of the legal entertainment services it purported to offer via interstate wire transmissions.

92.

These fraudulent uses of interstate mails constitutes "racketeering activity" within the meaning of 18 U.S.C. §1961(1). Collectively these violations constitute a "pattern of racketeering" within the meaning of 18 U.S.C. §1961(5) in which the Defendants intended to defraud Ms. Valente of legitimate earnings (as described above) by luring persons into The Cheetah Lounge and fraudulently and illegally offering the Menu good and services instead of the legal entertainment services it purported to offer via interstate mails.

93.

These instances of dispensing, possession, and distribution of illegal drugs (and to women without their consent and with intent to rape) constitute "racketeering activity" within the meaning of 18 U.S.C. §1961(1). Collectively these violations constitute a "pattern of racketeering" within the meaning of 18 U.S.C. §1961(5) in

which the Defendants intended to possess, distribute, and dispense illegal drugs, and intended to possess, distribute, and dispense illegal drugs to women without their consent and with intent to rape in violation of 21 U.S. Code § 841 and intended to economically, physically, and emotionally damage Ms. Valente.

94.

The Defendants' fraudulent and unlawful wire fraud, mail fraud, illegal drug distribution, possession, and dispensing, and illegal drug distribution, possession, and dispensing with intent to rape scheme consisted in part of deliberately claiming falsely that The Cheetah Lounge operated legally when such operations as conducted there by the Enterprise were, in fact, illegal under State and/or federal laws;  by claiming falsely that the Enterprise presented an equal, fair and level chance for all entertainers to make earnings when, in fact, the fraudulent and unlawful wire fraud, mail fraud, illegal drug distribution, possession, and dispensing, and illegal drug distribution, possession, and dispensing with intent to rape meant that such operations were designed to allow the Enterprise or its proxies to earn illegal revenues at the expense of Ms. Valente (and other entertainers) and serving as the proximate cause of economic (lost wages), physical (attempted rape and physical abuse), and emotional (depression and other long term effects) damage.

95.

The scheme also consisted of providing promotional incentives to conventioneers and out-of-state high-net worth putative customers, which were offered in order to lure those persons in as "marks" for Defendants' prey on and fraudulently obtain revenues from and the scheme also consisted of providing promotional and marketing designed to lure young, fresh, and unsuspecting entertainers as "marks" the Defendants and the Enterprise could illegally pimp the girls (without or without their knowledge) at The Cheetah Lounge when there was no legitimate opportunity to maximize earnings without participating in the Enterprise.

96.

As detailed in this Complaint, hereinabove, Defendants The Cheetah, the Conducting Supervisor Defendants, Conducting Floor Manager Defendants, Identified Personnel, Trac-Eric, and National Limousine were well aware that the Enterprise constituted fraudulent and unlawful wire fraud, mail fraud, illegal drug distribution, possession, and dispensing, and illegal drug distribution, possession, and dispensing with intent to rape under federal and under state law. Nonetheless, the Defendants intentionally subjected Ms. Valente (and other entertainers) to those risks or consciously disregarded those risks in order to maximize their profits at the expense of Ms. Valente (and other entertainers).

97.

Defendants The Cheetah, the Conducting Supervisor Defendants, Conducting Floor Manager Defendants, Identified Personnel, Trac-Eric, and National Limousine devised and furthered the scheme within and in furtherance of the Enterprise to defraud by use of the mail, telephone, and interstate wire facilities, and transmitted, or caused to be transmitted, by means of mail, email, and interstate wire facilities and wire communications with other members of the RICO Enterprise (Defendants), as well as the conversion/processing/adjudication of illegally obtained funds and transactional costs of the Cheetah Bucks activities, advertisements and other communications to the high-net worth individuals and potential entertainers mail, telephone, and interstate wire facilities for the purpose of illegal drug distribution, possession, and dispensing, and illegal drug distribution, possession, and dispensing with intent to rape.

98.

Defendants The Cheetah, the Conducting Supervisor Defendants, Conducting Floor Manager Defendants, Identified Personnel, Trac-Eric, and National Limousine engaged in a common course of conduct, with a similar pattern and purpose, intended to deceive and intended to obtain revenues and proceeds through illegal drug distribution, possession, and dispensing, and illegal drug distribution, possession,

and dispensing with intent to rape and other related activities.  Each separate illegal drug distribution, possession, and dispensing, and illegal drug distribution, possession, and dispensing with intent to rape employed by the Defendants The Cheetah, the Conducting Supervisor Defendants, Conducting Floor Manager Defendants, Identified Personnel, Trac-Eric, and National Limousine was related, had similar intended purposes, involved similar participants and methods of execution (Means of Operation) and had the same results affecting the same victims, including Ms. Valente.  Defendants The Cheetah, the Conducting Supervisor Defendants, Conducting Floor Manager Defendants, Identified Personnel, Trac-Eric, and National Limousine engaged in the pattern of racketeering activity for the purpose of conducting the ongoing business affairs of the Enterprise.

### 7.    Defendants' Motives

99.

The predicate acts all had the purpose of generating significant revenue and profits for Defendants The Cheetah, the Conducting Supervisor Defendants, Conducting Floor Manager Defendants, Identified Personnel, Trac-Eric, and National Limousine at the expense of Plaintiff Valente and other entertainers.  The predicate acts were committed or caused to be committed by Defendants through their participation in the RICO Enterprise described hereinabove and in furtherance

of their fraudulent schemes, and each involved in illegally obtaining monies on the back of, and to the detriment of, Ms. Valente and other entertainers.  Defendants The Cheetah, Braglia, and Hagood each also receive a portion of the processing fees from the conversion of credit into Cheetah Bucks for use in the illegal scheme alleged herein.

## 8.    Damages Caused By Defendants' Enterprise

100.

By reason of and as a result of the conduct of Defendants The Cheetah, the Conducting Supervisor Defendants, Conducting Floor Manager Defendants, Identified Personnel, Trac-Eric, and National Limousine, and in particular, by reason of their violation of federal law, state law, and the pattern of racketeering activity in the form of the predicate acts, Ms. Valente and other entertainers have been injured in their business and/or property in multiple ways, including but not limited damages in the form of losing clients (in the magnitude of hundreds of client transactions) because she refused to willingly participate and/or be complicit in in prostitution and the sale and consumption of illegal drugs, having her car keyed for her refusal to participate in the same, having her hand slammed in a door, having constant screaming/mental abuse and physical intimidation and abuse directed at her person, her illegal drugging and abuse with intent to rape, and emotionally in the form of

mental anguish and depression.  Defendants damaged her accordingly through the illegal drug distribution, possession, and dispensing, and illegal drug distribution, possession, and dispensing with intent to rape, wire and mail fraud, and other related activities, without which Ms. Valente would not have been damaged.  By virtue thereof, Defendants' predicate acts were the proximate cause of Ms. Valente and other entertainers' injuries.

## 101.

In addition, the Defendants' violations of 21 U.S. Code § 841 (relating to illegal drug distribution, dispensing, and possession and illegal drug distribution, dispensing, and possession with intent to rape), O.C.G.A. 16-13-30 (same), 18 U.S.C. §1341 (relating to mail fraud) and 18 U.S.C. §1343 (relating to wire fraud), and 18 U.S.C. §1962 (c) have directly and proximately caused injuries and damages to Plaintiff Valente and other entertainers in the form of losing clients (in the magnitude of hundreds of client transactions) because she refused to willingly participate in prostitution and the sale and consumption of illegal drugs, having her car keyed for her refusal to participate in the same, having her hand slammed in a door, having constant screaming/mental abuse and physical intimidation and abuse directed at her person, her illegal drugging and abuse with intent to rape, and emotionally in the form of mental anguish and depression.  Defendants' violations

of the above federal and state laws and the effects thereof are ongoing and will continue.

### 102.

Under the provisions of Section 1964(c), Defendants are jointly and severally liable to Ms. Valente for three times the damages Ms. Valente has sustained, as well as injunctive and equitable relief and the costs of this action and attorneys' fees.

**COUNT II**
**VIOLATIONS OF 18 U.S.C. § 1962(d)**
**(CONSPIRACY TO VIOLATE RICO STATUTE, 18 U.S.C. §1962 (c))**

### 103.

Plaintiffs restates and incorporate herein by reference the preceding paragraphs as if fully set forth herein.

### 104.

In the alternative, Defendants have violated § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c). Section 1962(d) of RICO provides that it "shall be unlawful for any person to conspire to violate any of the provision of subsection (a), (b), or (c) of this section."

### 105.

The object of this conspiracy has been and is to conduct or participate in,

directly or indirectly, the conduct of the affairs of, the Enterprise as described previously in Count I through a pattern of racketeering activity. Defendants conspired with, *inter alia*, each other, to promote and maintain the Enterprise.

106.

Defendants and their co-conspirators, including the Identified Personnel, have engaged in numerous overt and predicate fraudulent racketeering acts in furtherance of the conspiracy, including the activities described in Count I, which were deliberate and proximately caused the damage to Plaintiff described in Count I.

107.

The nature of the above-described acts by Defendants and their co-conspirators, including the Identified Personnel, in furtherance of the conspiracy gives rise to an inference that they not only agreed to the objective of an 18 U.S.C. § 1962(d) violation of RICO by conspiring to violate 18 U.S.C. § 1962(c), but also were aware that the ongoing acts described in Count I have been and are part of an overall pattern of racketeering of the Enterprise.

108.

As a direct and proximate result of Defendants' overt acts and predicate acts in furtherance of violating 18 U.S.C. § 1962(d), by conspiring to violate 18 U.S.C. § 1962(c), Ms. Valente and other entertainers have been and continue to be injured

in their person, business, and/or property as set forth more fully above.

109.

Defendants sought to and have engaged in the commission of and continue to commit overt acts, including the unlawful racketeering predicates acts described above and in Count I.  Defendants' violations of the above federal and state laws and the effects thereof are ongoing and will continue.  Ms. Valente and entertainers have been injured in their person, business, and property by reason of these violations as described above, and would not been injured had Defendants not conspired to violate 18 U.S.C. § 1962(c).

110.

Injuries suffered by Plaintiffs and members of the Class were directly and proximately caused by Defendants' racketeering activity as described above in Count I.

111.

By reason of the foregoing, and as a direct and proximate result of Defendants' illegal activities as described above and in Count I, Ms. Valente has suffered damages.  Ms. Valente is therefore entitled to compensatory damages, equitable relief, punitive damages, cost and reasonable attorneys' fees.  By virtue of these violations of 18 U.S.C. § 1962(d), Defendants are liable to Ms. Valente for

three times the damages Ms. Valente sustained, equitable and injunctive relief, and the cost of this suit, including reasonable attorney's fees.

## COUNT III
## VIOLATIONS OF GEORGIA RICO, (O.C.G.A. 16-14-4 (a) and (b))

### 112.

Plaintiff Valente, realleges and incorporates herein by reference each of the allegations contained in the preceding paragraphs of this Complaint.

### 113.

Conducting Supervisor Defendants, Conducting Floor Manager Defendants, Identified Personnel, Directing Payment Processors, Trac-Eric, and National Limousine, through a pattern of racketeering activity, acquired and maintained, directly and indirectly, a monetary interest in the Enterprise.  Conducting Supervisor Defendants, Conducting Floor Manager Defendants, Directing Payment Processors, Trac-Eric, and National Limousine, and with use of the Identified Personnel, in the course of being associated with the Enterprise as described herein, in concert, did also participate in and conduct the affairs of, directly and indirectly, the Enterprise through a pattern of racketeering activity.

### A.    THE ENTERPRISE ALLEGATIONS

### 114.

Plaintiff alleges in the aggregate, one association-in-fact enterprise, the Enterprise, operated by Defendants.   Under Georgia's RICO, an "'[e]nterprise' means any person, sole proprietorship, partnership, corporation, business trust, union chartered under the laws of this state, or other legal entity; or any unchartered union, association, or group of individuals associated in fact although not a legal entity; and it includes illicit as well as licit enterprises and governmental as well as other entities."  O.C.G.A. 16-14-3(6).

### 1.    The Enterprise

### 115.

For purposes of this claim, the RICO "enterprise" (Enterprise) is an association-in-fact consisting of:  The various Defendants, including The Cheetah, the Conducting Supervisor Defendants, the Conducting Floor Manager Defendants, the Identified Personnel, National Limousine, and Trac-Eric.  As noted above, these persons comprise the Enterprise with a *modus operandi* described in Paragraphs 9-15, and each Defendant knew of or clearly and willfully ignored the illegality of the Enterprise and played a part in directing/conducting the affairs of the Enterprise (*e.g.,* the Means of Operation).

### 2.    Each Enterprise Member Had a Shared Purpose in The Success of the Enterprise and Its Illegal Drug Sales and Distribution, Prostitution, and Illegal Drugging.

116.

The Enterprise includes Defendants The Cheetah, Hagood, and Braglia in and of the Enterprise (as identified above) who knowingly provided funds to finance all or part of the Enterprise of the Defendants.  By virtue of the investments and financing, the scheme of the Defendants was able to continue, to flourish and to grow.  The investments made by Defendants The Cheetah, Hagood, and Braglia provided the Defendants with credibility and legitimacy through the provision of a decadent atmosphere and alcohol, which allowed and allows them to attract more entertainers as conspirators to prostitute, grow their drug sale and distributions cartel, and to attract high-net worth individuals as customers into the scheme and allowed the Enterprise to operate.  Defendants The Cheetah, Hagood, and Braglia had and have a systematic linkage to the Enterprise because of the contractual relationship, financial ties and coordination of activities, as well as numerous meetings, ongoing communications, and the conducting of due diligence on the part of Defendants The Cheetah, Hagood, and Braglia, such that they conducted/directed the infrastructure of the Enterprise, and did know or clearly and willfully ignored that the other Defendants were conducting an ongoing illegal operation and that representations otherwise were false and fraudulent.  Despite this, Defendants The

Cheetah, Hagood, and Braglia joined together with the Defendants to conduct the Enterprise for the shared purpose of earning revenues through the illegal operations, which include a pattern of sexual abuse, assault, drug distribution and sale, prostitution, attempted rape, racketeering, illegal drugging, keeping a place of prostitution, pimping, and pandering.  At all relevant times, each of Defendants The Cheetah, Hagood, and Braglia were a knowing participant in that Enterprise, profited from the scheme and was aware of the involvement of other Defendants.

## 117.

Defendant Trac-Eric is the holding company for the land upon which The Cheetah Lounge and its parking lot reside, and one of the central points the Enterprise uses to conduct all or part of the illegal Enterprise of Defendants (as identified above).  Defendant Trac-Eric provided and provides a lease in favor of The Cheetah and provides the Enterprise and other Defendants with credibility and legitimacy by leasing The Cheetah and/or the Enterprise a prime piece of real estate and ability to provide high-end food and beverages, which allowed and allows them to attract more unknowing new entertainers and high-net worth customers. Defendant Trac-Eric had and has a systematic linkage to the Enterprise because of the contractual relationship, financial ties and coordination of activities, as well as numerous meetings and the conducting of due diligence on the part of the Defendant

Trac-Eric with respect to Defendants The Cheetah and Hagood, such that it knew or clearly and willfully ignored that the Defendants were conducting an ongoing illegal operation.  Despite this, the Directing Payment Processors joined together with the Defendants to conduct the Enterprise for the shared purpose of earning revenues through the illegal operations, which include a pattern of sexual abuse, assault, drug distribution and sale, prostitution, attempted rape, racketeering, illegal drugging, keeping a place of prostitution, pimping, and pandering.  At all relevant times, Defendant Trac-Eric was aware of the Defendants' scheme and was a knowing participant in that Enterprise, profited from the scheme and was aware of the involvement of the Conducing Manager Defendants in the scheme.

118.

Defendants National Limousine, the driver and limousine service, is one of the channels of distribution for directing/conducting the transfer of drugs from outside The Cheetah Lounge into The Cheetah Lounge from high-net worth customers to Defendants herein and received substantial funds for facilitating all or part of the illegal Enterprise of Defendants (as identified above).  Defendant National Limousine provided and continues to provide the Defendants with the credibility and legitimacy in providing high end driver services and illegal drugs, which allowed them to attract more unknowing new entertainers and high-net worth

customers by providing a low-risk corridor in which to traffic illegal drugs into The Cheetah Lounge.  Defendant National Limousine had and has a systematic linkage to the Enterprise because of the contractual relationship with The Cheetah, the acquisition of its limousine from The Cheetah, financial ties, and coordination of activities, as well as numerous meetings between it and the Directing Manager Defendants such that Defendant National Limousine knew or clearly and willfully ignored that the Defendants were conducting an ongoing illegal operation.  Despite this, National Limousine joined together with the Defendants to conduct the Enterprise for the shared purpose of earning revenues through the illegal operations, which includes a pattern of sexual abuse, assault, drug distribution and sale, prostitution, attempted rape, racketeering, illegal drugging, keeping a place of prostitution, pimping, and pandering.  At all relevant times, Defendant National Limousine was aware of the Defendants scheme and was a knowing participant in that Enterprise, profited from the scheme and was aware of the involvement of the Conducing Manager Defendants, Identified Personnel, and the Conducting Floor Manager Defendants in the scheme.

119.

The Conducting Floor Manager Defendants includes the floor managers who directed/conducted and direct/conduct security of the Enterprise, offered and offer

the Menu to customers, and directed/conducted, direct/conduct, and/or oversee the transfer of illegal drugs from National Limousine, among other channels, and by and through the Identified Personnel, among other persons, to high-net worth customers, conspirators, including certain Identified Personnel, and/or unsuspecting entertainers (in the case that the "Bill Cosby Special" was ordered by a customer), and received and receive substantial funds for facilitating all or part of the illegal Enterprise of Defendants (as identified above).   The Conducting Floor Manager Defendants provided and provide the Defendants with supervision of the underground distribution channel within The Cheetah Lounge for the sale and delivery of illegal drugs and also provide security to the Enterprise to ensure that the high-net worth customers could participate in illegal goods and services without concern for law enforcement or otherwise being exposed, which allowed and allows the Enterprise to attract more high-net worth customers.   The Conducting Floor Manager Defendants had and have a systematic linkage to the Enterprise because of the contractual relationship, financial ties and coordination of activities, as well as numerous meetings with Conducting Supervisor Defendants, National Limousine, and Identified Personnel such that they knew or clearly and willfully ignored that the Defendants were conducting an ongoing illegal operation.   Despite this, the Conducting Floor Manager Defendants joined together with the Defendants to

conduct the Enterprise for the shared purpose of earning revenues through the illegal operations, which include a pattern of sexual abuse, assault, drug distribution and sale, prostitution, attempted rape, racketeering, illegal drugging, keeping a place of prostitution, pimping, and pandering.  At all relevant times, each of the Conducting Floor Manager Defendants were aware of the Defendants scheme and was a knowing participant in that Enterprise, profited from the scheme and was aware of the involvement of the other Defendants in the scheme.

120.

The Conducting Supervisor Defendants includes the managers that directed/conducted and direct/conduct the overall affairs of the entirety of the Enterprise, including provision of security and the Menu from Conducting Floor Manager Defendants, provision of the illegal drugs through the Identified Personnel channels, provision of the drugs entering The Cheetah Lounge through National Limousine, provision of rooms and land and property from Trac-Eric for the lewd activities and drug activities to occur, securing of investment funds by Defendants Bill Hagood and Jack Braglia, and contracting for payment processing services for Cheetah Bucks and driving the supply of high-net worth customers, conspirators, including certain Identified Personnel, and/or unsuspecting entertainers (in the case that the "Bill Cosby Special" was ordered by a customer), and received substantial

funds for facilitating all or part of the illegal Enterprise of Defendants (as identified above).   The Conducting Supervisor Defendants provided and provide the Defendants with supervision of the underground distribution channel within The Cheetah Lounge for the sale and delivery of illegal drugs and illegal services, including security, the Menu, illegal drugs, rooms and land and property, investment funds, and payment processing services.  The Conducting Supervisor Defendants had and have a systematic linkage to the Enterprise because of the contractual relationship, financial ties and coordination of activities, as well as numerous meetings with Conducting Floor Manager Defendants, Identified Personnel, National Limousine, and Trac-Eric, such that they knew or clearly and willfully ignored that the Defendants were conducting an ongoing illegal operation.  Despite this, the Conducting Supervisor Defendants joined together with the Defendants to conduct the Enterprise for the shared purpose of earning revenues through the illegal operations, which include a pattern of sexual abuse, assault, drug distribution and sale, prostitution, attempted rape, racketeering, illegal drugging, keeping a place of prostitution, pimping, and pandering.  At all relevant times, each of the Conducting Supervisor Defendants were aware of the Defendants scheme and was a knowing participant in that Enterprise, profited from the scheme and was aware of the involvement of the other Defendants in the scheme.

121.

The Identified Personnel were the subject of the pimping, pandering, place of prostitution and delivery point for the sale, possession, and distribution of the illegal drugs and prostitution, and conduct the affairs of the enterprise and have a systematic linkage with the Enterprise due to their contractual relationship for their employ with The Cheetah and knew or clearly and willfully ignored that the Defendants were conducting an ongoing illegal operation

**B.     The Racketeering Activity and Pattern of Racketeering**

122.

"Racketeering activity" means, among other enumerated activity, to commit, to attempt to commit, or to solicit, coerce, or intimidate another person to commit prostitution, pimping, pandering, assault, 18 U.S.C. §1341, relating to mail fraud, 18 U.S.C. §1343, relating to wire fraud and 21 U.S. Code § 841, relating to dispensing, possession, and distributions of illegal drugs (and to women without their consent and with intent to rape), assault, and keeping a house of prostitution.  O.C.G.A. 16-14-3(8)(A)(xi),(i), (v), (xi), and (xxix).  Each of these acts were engaged in two or more times within the last four years.

123.

Under Georgia RICO, a "pattern of racketeering activity" means

engaging in at least two acts of racketeering activity in furtherance of one or more incidents, schemes, or transactions that have the same or similar intents, results, accomplices, victims, or methods of commission or otherwise are interrelated by distinguishing characteristics and are not isolated incidents, provided at least one of such acts occurred after July 1, 1980, and that the last of such acts occurred within four years, excluding any periods of imprisonment, after the commission of a prior act of racketeering activity. . . .

O.C.G.A. 16-14-3(8)(A).  As shown below, the Defendants engaged in at least two acts of racketeering activity in furtherance of the Enterprise and incidents, schemes, and transactions that have the same or similar intents, results, accomplices, victims, and methods of commission and are interrelated by distinguishing characteristics and are not isolated incidents.  Defendants engaged in at least two acts of each of the racketeering activity outlined below in furtherance of the shared intent and purpose of the Enterprise in the last four years.

### 3.    Defendants' Use Of The Mails And Wires

### 124.

Each of the Conducting Supervisor Defendants, Conducting Floor Manager Defendants, and The Cheetah, engaged in and affected interstate commerce because they engage in the following activities across state boundaries through use of the mail services and wires:  The sale, purchase and administration of the financing and receipt of revenues to run and support the Enterprise's illegal activities by

Defendants herein; and/or the transmission and/or receipt of sales and marketing literature, including the Cheetah Newsletter, which is sent via email, and its website, which targets out of town "conventioneers" and "businessmen"; and/or transmission and/or receipt of invoices, statements and payments related to the operations of Defendants and the Enterprise.   The use of interstate and international mail and wire was for the purposes of obtaining money or property by means of omissions, false pretenses and misrepresentations.

    **4.**    **The Predicate Acts Of Wire Fraud, Mail Fraud, Illegal Drug Sales and Distribution, Illegal Drugging with Intent to Rape, Assault, and Keeping a Place of Prostitution, Pandering, and Pimping**

    **a.**    **Wire Fraud and/or Mail Fraud**

125.

The Defendants' fraudulent and wrongful practices, illegal conduct and violations of RICO comprised of the Enterprise were carried out by an array of certain Identified Personnel, and customers, traveling across state boundaries, and the Defendants necessarily relied upon interstate travel and information, products (credit card processing) and funds by the U.S. mails and/or interstate wire facilities. Additionally, the Enterprise via The Cheetah directly markets to sport games, conventions, and other events, offering reduced entry fees to those customers that

prove affiliation with these events, which are heavily attended by out-of-state persons. *See* https://www.thecheetah.com/about/ (soliciting "conventioneers"); *see also,* https://www.thecheetah.com/about/faq/ (recommending hotels for out-of-towners).

126.

The nature and pervasiveness of the Defendants Enterprise, which is orchestrated out of The Cheetah Lounge, necessarily required communication directly and frequently by the U.S. mails and/or interstate wire facilities with various conspirators, including certain Identified Personnel, and customers with respect to chargeback issues, credit card charges, credit card issues, travel arrangements via National Limousine, and other payment and services related accommodations and issues.

127.

In addition, Defendants entire Enterprise was and is conducted with its need to communicate and interact with its respective out of state customer base, and by its very nature therefore, engaged in wire communications which were false, fraudulent and illegal.

128.

Many of the precise dates of the Defendants' uses of the U.S. mails and

interstate wire facilities (and corresponding RICO predicate acts of mail and wire fraud) have been hidden and cannot be alleged without access to the Defendants' books and records. Indeed, an essential part of the successful operations of the illegal scheme and/or the unlawful misrepresentations that such operations were legally being conducted as a gentleman's club, depended upon secrecy, and in fact Defendants' took deliberate steps to conceal their wrongdoing.  However, Plaintiffs can generally describe the occasions on which the RICO predicates acts of mail and wire fraud occurred, and how those acts were in furtherance of the Defendants' illegal Enterprise.

129.

For instance, each of the customers described in Paragraphs 54-58 were out-of-state customers that traveled to The Cheetah Lounge.  Each of these customers were marketed to and targeted by the Enterprise through interstate commerce, used interstate commerce to arrive at The Cheetah Lounge, and each had out-of-state credit cards that were processed and transactions finalized via interstate wire facilities, including by conversion of that credit to Cheetah Bucks.  Additionally, the "Cheetah Newsletter" is distributed via interstate wire facilities and The Cheetah generally markets to out-of-towners via its website so they visit The Cheetah Lounge during their stay in Atlanta.   *See* https://www.thecheetah.com/about/ (soliciting

"conventioneers");   *see*   *also,*   https://www.thecheetah.com/about/faq/ (recommending hotels for out-of-towners).

130.

Each act of mail fraud and wire fraud as aforementioned constituted a violation of 18 U.S.C. §1341 relating to mail fraud and 18 U.S.C. §1343 relating to wire fraud.

### b.     Illegal Drug Sales and Distribution, and Illegal Drugging with Intent to Rape

In addition, by carrying on illegal Enterprise, Defendants have engaged in predicate acts comprised of illegal drug sales, illegal drug trafficking, dealing in a controlled substance or listed chemical (as defined in section 102 of the Controlled Substances Act, including ketamine [Schedule III], gamma-hydroxybutyric acid (GHB) [Schedule 1], and/or cocaine [Schedule II], thereby violating federal and state drug laws.

The Defendants all committed predicate acts under RICO, in violation of 21 U.S. Code § 841, which provides in relevant part:

(b) UNLAWFUL ACTS.  Except as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally—

(1) to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance; or

(b) **PENALTIES**.  Except as otherwise provided in section 849, 859, 860, or 861 of this title, any person who violates subsection (a) of this section shall be sentenced as follows:

\*          \*          \*

(C) *In the case of a controlled substance in schedule I or II, gamma hydroxybutyric acid* (including when scheduled as an approved drug product for purposes of section 3(a)(1)(B) of the Hillory J. Farias and Samantha Reid Date-Rape Drug Prohibition Act of 2000), or 1 gram of flunitrazepam, except as provided in subparagraphs (A), (B), and (D), *such person shall be sentenced to a term of imprisonment of not more than 20 years and if death or serious bodily injury results from the use of such substance shall be sentenced to a term of imprisonment of not less than twenty years or more than life, a fine not to exceed the greater of that authorized in accordance with the provisions of title 18 or $1,000,000 if the defendant is an individual or $5,000,000 if the defendant is other than an individual, or both*. If any person commits such a violation after a prior conviction for a felony drug offense has become final, such person shall be sentenced to a term of imprisonment of not more than 30 years and if death or serious bodily injury results from the use of such substance shall be sentenced to life imprisonment, a fine not to exceed the greater of twice that authorized in accordance with the provisions of title 18 or $2,000,000 if the defendant is an individual or $10,000,000 if the defendant is other than an individual, or both. Notwithstanding section 3583 of title 18, any sentence imposing a term of imprisonment under this paragraph shall, in the absence of such a prior conviction, impose a term of supervised release of at least 3 years in addition to such term of imprisonment and shall, if there was such a prior conviction, impose a term of supervised release of at least 6 years in addition to such term of imprisonment. Notwithstanding any other provision of law, the court shall not place on probation or suspend the sentence of any person sentenced under the provisions of this subparagraph which provide for a mandatory term of imprisonment if death or serious bodily injury results,

nor shall a person so sentenced be eligible for parole during the term of such a sentence.

*         *              *

(7) Penalties for distribution.—

    (A) In general.—

        Whoever, with intent to commit a crime of violence, as defined in section 16 of title 18 (***including rape***), against an individual, violates subsection (a) by distributing a controlled substance or controlled substance analogue to that individual without that individual's knowledge, ***shall be imprisoned not more than 20 years and fined in accordance with title 18***.

    (B) Definition.—

        For purposes of this paragraph, the term "without that individual's knowledge" means that the individual is unaware that a substance with the ability to alter that individual's ability to appraise conduct or to decline participation in or communicate unwillingness to participate in conduct is administered to the individual.

21 U.S. Code § 841 (emphasis added).

131.

Defendants and Identified Personnel dealt in a controlled substance and/or listed chemical (as defined in section 102 of the Controlled Substances Act because they meet the elements of 21 U.S. Code § 841 by distributing, dispensing, and possessing illegal drugs (including gamma-hydroxybutyric acid (GHB), ketamine, and/or cocaine) and with intent to distribute to customers and entertainers, and dispensing those illegal drugs to, among others, Ms. Valente, without their

knowledge, without their (her) knowledge and with intent to commit a crime of rape

against them (Ms. Valente) as described above, two or more times.

132.

Defendants also violated Georgia law.  O.C.G.A. 16-13-30 (2010) provides:

**16-13-30**. Purchase, possession, manufacture, distribution, or sale of controlled substances or marijuana; penalties

> (a) Except as authorized by this article, it is unlawful for any person to purchase, possess, or have under his control any controlled substance.

> (b) Except as authorized by this article, it is unlawful for any person to manufacture, deliver, distribute, dispense, administer, sell, or possess with intent to distribute any controlled substance.

> (c) Except as otherwise provided, any person who violates subsection (a) of this Code section with respect to a controlled substance in Schedule I or a narcotic drug in Schedule II shall be guilty of a felony and, upon conviction thereof, shall be punished by imprisonment for not less than two years nor more than 15 years. Upon conviction of a second or subsequent offense, he shall be imprisoned for not less than five years nor more than 30 years.

> (d) Except as otherwise provided, any person who violates subsection (b) of this Code section with respect to a controlled substance in Schedule I or Schedule II shall be guilty of a felony and, upon conviction thereof, shall be punished by imprisonment for not less than five years nor more than 30 years. Upon conviction of a second or subsequent offense, he or she shall be imprisoned for not less than ten years nor more than 40 years or life imprisonment. The provisions of subsection (a) of Code Section 17-10-7 shall not apply to a sentence imposed for a

second such offense; provided, however, that the remaining provisions of Code Section 17-10-7 shall apply for any subsequent offense.

(e) Any person who violates subsection (a) of this Code section with respect to a controlled substance in Schedule II, other than a narcotic drug, shall be guilty of a felony and, upon conviction thereof, shall be punished by imprisonment for not less than two years nor more than 15 years. Upon conviction of a second or subsequent offense, he shall be punished by imprisonment for not less than five years nor more than 30 years.

Defendants and Identified Personnel dealt in a controlled substance and/or listed chemical (as defined in section 102 of the Controlled Substances Act because they meet the elements of 21 U.S. Code § 841 by distributing, dispensing, and possessing illegal drugs (including gamma-hydroxybutyric acid (GHB), ketamine, and/or cocaine) and with intent to distribute to customers and conspirators, including certain Identified Personnel, and dispensing those illegal drugs to, among others, Ms. Valente, without their (her) knowledge and with intent to commit (or facilitate the commission of) the crime of rape against them (Ms. Valente) as described above.

### c.    Assault

### 133.

Through their tactics of fear, intimidation, abuse, screaming, and hostility, Defendants acted on two or more occasions with intent to create an apprehension

that an injury may be inflicted against Plaintiff Valente.

134.

With respect to the Conducting Floor Manager Defendants, they had a reasonable apparent present ability to inflict such injury due to their large physical stature as compared to Plaintiff Valente's physical stature.  As noted elsewhere in this Complaint, the general hostile, aggressive, and abusive atmosphere of The Cheetah, and at least one of the Conducting Floor Manger Defendants at The Cheetah indeed inflicted physical injury on Ms. Valente, created an imminent threat to Ms. Valente of bodily injury that was reasonable, and that threat was communicated by Defendants in concert with the Conducting Floor Manager Defendants.

135.

### d.    Keeping a House of Prostitution, Pandering, and Pimping

Defendants had and exercised control over the use of The Cheetah Lounge, which offered seclusion and shelter for the practice of prostitution in the various secluded portions of the club, including VIP rooms areas, on two or more occasions. Defendants knowingly granted and permitted the use of The Cheetah Lounge the purpose of prostitution.

136.

Defendants offered and agreed, on two or more occasions, to procure certain of the Identified Personnel for the purpose of prostitution, and did arrange meetings of persons for the purpose of prostitution, and received money and value from the Identified Personnel in the form of monies paid to the Conducting Floor Manager Defendants, The Cheetah, and Conducting Supervisor Defendants from the, including certain Identified Personnel,' tips. Defendants had knowledge it was earned in whole or in part from prostitution. Defendants aided or abetted, counseled, and commanded certain of the Identified Personnel in the commission or prostitution and assisted in doing so, where, as described above, the proceeds and profits derived therefrom were divided in a pro-rata basis.

137.

Defendants solicited certain of the Identified Personnel to perform acts of prostitution on behalf of customers and knowingly assembled them at The Cheetah Lounge for the purpose of being solicited by others to perform acts of prostitution.

## 5.    The Conduct Of The Rico Enterprise Affairs' And Rico Conspiracy

138.

Each of the Defendants have exerted control over their respective Enterprises

and in violation of O.C.G.A. 16-14-4(a) and (b) of the Georgia RICO statute, have conducted, participated in, and directed the affairs of the RICO enterprise, directly or indirectly, and acquired or maintained, directly or indirectly, an interest in or control of the Enterprise, including at least money, as described above.

### 6. Pattern Of Racketeering Activity Through Predicate Acts Of Wire Fraud, Mail Fraud, Illegal Drug Sales and Distribution, Illegal Drugging with Intent to Rape, Assault, and Keeping a House of Prostitution, Pandering, and Pimping

139.

Defendants The Cheetah, the Conducting Supervisor Defendants, Conducting Floor Manager Defendants, Identified Personnel, Trac-Eric, and National Limousine have conducted and directed the affairs of the Enterprise through a pattern of racketeering activity as noted above, including acts that are indictable under 18 U.S.C. §1341, relating to mail fraud, 18 U.S.C. §1343, relating to wire fraud and 21 U.S. Code § 841, relating to dispensing, possession, and distributions of illegal drugs (and to women without their consent and with intent to rape), O.C.G.A. 16-13-30, relating to dispensing, possession, distribution of illegal drugs, O.C.G.A. 16-5-2, relating to assault, O.C.G.A. 16-6-10—12, related to keeping a place of prostitution, pimping, and pandering.

140.

The Defendants' pattern of racketeering likely involved hundreds if not thousands of separate instances of the use of the internet and wires and use of the U.S. mails in furtherance of the enterprise and scheme, and hundreds if not thousands of violations of 21 U.S. Code § 841 and O.C.G.A. 16-13-30 by the Enterprise, and these violations described in this Complaint will continue to occur if the Enterprise is not stopped.

141.

These fraudulent interstate wire transmissions constitute "racketeering activity" within the meaning of § 16-14-3(9)(A). Collectively these violations constitute a "pattern of racketeering" within the meaning of § 16-14-3(8)(A) in which the Defendants intended to defraud Ms. Valente of legitimate earnings (as above) by luring persons into The Cheetah Lounge and fraudulently and illegally offering the Menu good and services instead of the legal entertainment services it purported to offer via interstate wire transmissions, and intimating through assault those that did not participate.

142.

These fraudulent uses of interstate mails constitute "racketeering activity" within the meaning of § 16-14-3(9)(A). Collectively these violations constitute a

"pattern of racketeering" within the meaning of § 16-14-3(8)(A) in which the Defendants intended to defraud Ms. Valente of legitimate earnings (as described above) by luring persons into The Cheetah Lounge and fraudulently and illegally offering the Menu good and services instead of the legal entertainment services it purported to offer via interstate mails.

143.

These instances of dispensing, possession, and distribution of illegal drugs (and to women without their consent and with intent to rape) constitute "racketeering activity" within the meaning of § 16-14-3(9)(A).  Collectively these violations constitute a "pattern of racketeering" within the meaning of § 16-14-3(8)(A)  in which the Defendants intended to possess, distribute, and dispense illegal drugs, and intended to possess, distribute, and dispense illegal drugs to women without their consent and with intent to rape in violation of 21 U.S. Code § 841 and intended to economically, physically, and emotionally damage Ms. Valente.

144.

These instances of assault constitute "racketeering activity" within the meaning of § 16-14-3(9)(A).  Collectively these violations constitute a "pattern of racketeering" within the meaning of § 16-14-3(8)(A)  in which the Defendants

intended to assault Ms. Valente and other entertainers and intended to economically, physically, and emotionally damage Ms. Valente.

145.

These instances of keeping a place of prostitution, pandering, and pimping constitute "racketeering activity" within the meaning of § 16-14-3(9)(A). Collectively these violations constitute a "pattern of racketeering" within the meaning of § 16-14-3(8)(A) in which the Defendants intended to keep a place of prostitution, pander, and pimp and intended to economically, physically, and emotionally damage Ms. Valente.

146.

The Defendants' fraudulent and unlawful wire fraud, mail fraud, illegal drug distribution, possession, and dispensing, illegal drug distribution, possession, and dispensing with intent to rape, assault, keeping a place of prostitution, pandering, and pimping scheme consisted in part of deliberately claiming falsely that The Cheetah Lounge operated legally when such operations as conducted there by the Enterprise were, in fact, illegal under State and/or federal laws;  by claiming falsely that the Enterprise presented an equal, fair and level chance for all entertainers to make earnings when, in fact, the fraudulent and unlawful wire fraud, mail fraud,

illegal drug distribution, possession, and dispensing, illegal drug distribution, possession, and dispensing with intent to rape, assault, keeping a place of prostitution, pandering, and pimping meant that such operations were designed to allow the Enterprise or its proxies to earn illegal revenues at the expense of Ms. Valente (and other entertainers) and serving as the proximate cause of economic (lost wages), physical (attempted rape and physical abuse), and emotional (depression and other long term effects) damage.

147.

The scheme also consisted of providing promotional incentives to conventioneers and out-of-state high-net worth putative customers, which were offered in order to lure those persons in as "marks" for Defendants' prey on and fraudulently obtain revenues from and the scheme also consisted of providing promotional and marketing designed to lure young, fresh, and unsuspecting entertainers as "marks" the Defendants and the Enterprise could illegally pimp the girls (without or without their knowledge) at The Cheetah Lounge when there was no legitimate opportunity to maximize earnings without participating in the Enterprise.

148.

As detailed in this Complaint, hereinabove, Defendants The Cheetah, the

Conducting Supervisor Defendants, Conducting Floor Manager Defendants, Identified Personnel, Trac-Eric, and National Limousine were well aware that the Enterprise constituted fraudulent and unlawful wire fraud, mail fraud, illegal drug distribution, possession, and dispensing, illegal drug distribution, possession, and dispensing with intent to rape, assault, keeping a place of prostitution, pandering, and pimping under federal and under state law.   Nonetheless, the Defendants intentionally subjected Ms.  Valente (and other entertainers) to those risks or consciously disregarded those risks in order to maximize their profits at the expense of  Ms. Valente (and other entertainers).

149.

Defendants The Cheetah, the Conducting Supervisor Defendants, Conducting Floor Manager Defendants, Identified Personnel, Trac-Eric, and National Limousine devised and furthered the scheme within and in furtherance of the Enterprise to defraud by use of the mail, telephone, and interstate wire facilities, and transmitted, or caused to be transmitted, by means of mail, email, and interstate wire facilities and wire communications with other members of the RICO Enterprise (Defendants), as well as the conversion/processing/adjudication of illegally obtained funds and transactional costs of the Cheetah Bucks activities, advertisements and other communications to the high-net worth individuals and potential entertainers mail,

telephone, and interstate wire facilities for the purpose of illegal drug distribution, possession, and dispensing, illegal drug distribution, possession, and dispensing with intent to rape, assault, keeping a place of prostitution, pandering, and pimping.

150.

Defendants The Cheetah, the Conducting Supervisor Defendants, Conducting Floor Manager Defendants, Identified Personnel, Trac-Eric, and National Limousine engaged in a common course of conduct, with a similar pattern and purpose, intended to deceive and intended to obtain revenues and proceeds through illegal drug distribution, possession, and dispensing, illegal drug distribution, possession, and dispensing with intent to rape, assault, keeping a place of prostitution, pandering, and pimping and other related activities.  Each separate illegal drug distribution, possession, and dispensing, illegal drug distribution, possession, and dispensing with intent to rape, assault, keeping a place of prostitution, pandering, and pimping employed by the Defendants, The Cheetah, the Conducting Supervisor Defendants, Conducting Floor Manager Defendants, Identified Personnel, Trac-Eric, and National Limousine was related, had similar intended purposes, involved similar participants and methods of execution (Means of Operation) and had the same results affecting the same victims, including Plaintiff Valente.  Defendants The Cheetah, the Conducting Supervisor Defendants, Conducting Floor Manager Defendants,

Identified Personnel, Trac-Eric, and National Limousine engaged in the pattern of racketeering activity for the purpose of conducting the ongoing business affairs of the Enterprise.

### 7.    Defendants' Motives

### 151.

The predicate acts all had the purpose of generating significant revenue and profits for Defendants The Cheetah, the Conducting Supervisor Defendants, Conducting Floor Manager Defendants, Identified Personnel, Trac-Eric, and National Limousine at the expense of Ms. Valente and other entertainers.  The predicate acts were committed or caused to be committed by Defendants through their participation in the RICO Enterprise described hereinabove and in furtherance of their fraudulent schemes, and each involved in illegally obtaining monies on the back of, and to the detriment of, Ms. Valente and other entertainers.  Defendants The Cheetah, Braglia, and Hagood each also receive a portion of the processing fees from the conversion of credit into Cheetah Bucks for use in the illegal scheme alleged herein.

### 8.    Damages Caused By Defendants' Enterprise

### 152.

By reason of and as a result of the conduct of Defendants The Cheetah, the Conducting Supervisor Defendants, Conducting Floor Manager Defendants, Identified Personnel, Trac-Eric, and National Limousine, and in particular, by reason of their violation of federal law, state law, and the pattern of racketeering activity in the form of the predicate acts, Ms. Valente and entertainers have been injured in their business and/or property in multiple ways, including but not limited damages in the form of losing clients (in the magnitude of hundreds of client transactions) because she refused to willingly participate and/or be complicit in in prostitution and the sale and consumption of illegal drugs, having her car keyed for her refusal to participate in the same, having her hand slammed in a door, having constant screaming/mental abuse and physical intimidation and abuse directed at her person, her illegal drugging and abuse with intent to rape, and emotionally in the form of mental anguish and depression.  Defendants damaged her accordingly through the illegal drug distribution, possession, and dispensing, and illegal drug distribution, possession, and dispensing with intent to rape, wire and mail fraud, assault, keeping a place of prostitution, pandering, pimping and other related activities, without which Ms. Valente would not have been damaged.  By virtue thereof, Defendants' predicate acts were the proximate cause of Ms. Valente and other entertainers' injuries.

153.

In addition, the Defendants' violations of 21 U.S. Code § 841 (relating to illegal drug distribution, dispensing, and possession and illegal drug distribution, dispensing, and possession with intent to rape), O.C.G.A. 16-13-30 (same), 18 U.S.C. §1341 (relating to mail fraud) and 18 U.S.C. §1343 (relating to wire fraud), O.C.G.A. 16-5-20 (relating to assault), O.C.G.A. 16-6-10 (relating to keeping a place of prostitution), O.C.G.A. 16-6-11 (relating to pandering), O.C.G.A. 16-6-12 (related to pimping), and O.C.G.A. 16-14-4(a)-(b) have directly and proximately caused injuries and damages to Plaintiff Valente and other entertainers in the form of losing clients (in the magnitude of hundreds of client transactions) because she refused to willingly participate in prostitution and the sale and consumption of illegal drugs, having her car keyed for her refusal to participate in the same, having her hand slammed in a door, having constant screaming/mental abuse and physical intimidation and abuse directed at her person, her illegal drugging and abuse with intent to rape, and emotionally in the form of mental anguish and depression. Defendants' violations of the above federal and state laws and the effects thereof are ongoing and will continue.

154.

Defendants' actions outlined above were intentional, planned, willful and

exhibited reckless indifference towards the Plaintiff Valente such as to warrant punitive damages.

155.

Defendants are jointly and severally liable to Ms. Valente for three times the damages Ms. Valente has sustained, as well as punitive damages, injunctive and equitable relief and the costs of this action and attorneys' fees.

## COUNT IV
## CONSPIRACY TO VIOLATE GEORGIA RICO (O.C.G.A. 16-14-4 (c))

156.

Plaintiff restates and incorporates herein by reference the preceding paragraphs as if fully set forth herein.

157.

In the alternative, Defendants did conspire and endeavor to violate O.C.G.A 16-14-4 (a) and (b) for the reasons set forth in Count III.

158.

Defendants have violated O.C.G.A. 16-14-4 (c) by conspiring to violate O.C.G.A 16-14-4 (a) and (b). The object of this conspiracy has been and is to conduct or participate in, directly or indirectly, the conduct of the affairs of, the Enterprise as described previously in Count III through a pattern of racketeering

activity.   Defendants conspired with, *inter alia*, each other, to promote the Enterprise.

159.

Defendants and their co-conspirators, including the Identified Personnel, have engaged in numerous overt and predicate fraudulent racketeering acts in furtherance of the conspiracy, including the activities described in Count III, which were deliberate and proximately caused the damage to Plaintiff described in Count III.

160.

The nature of the above-described acts by Defendants and their co-conspirators, including the Identified Personnel, in furtherance of the conspiracy gives rise to an inference that they not only agreed to the objective of the Enterprise under O.C.G.A. 16-14-4 (c)  in violation of Georgian RICO by conspiring to violate O.C.G.A 16-14-4 (a) and (b), but also were aware that the ongoing acts described in Count III have been and are part of an overall pattern of racketeering of the Enterprise.

161.

As a direct and proximate result of Defendants' overt acts and predicate acts in furtherance of violating O.C.G.A. 16-14-4 (c), by conspiring to violate O.C.G.A 16-14-4 (a) and (b), Ms. Valente and other entertainers have been and continue to be

injured in their person, business, and/or property as set forth more fully above.

162.

Defendants sought to and have engaged in the commission of and continue to commit overt acts, including the unlawful racketeering predicates acts described above and in Count III.  Defendants' violations of the above federal and state laws and the effects thereof are ongoing and will continue.  Ms. Valente and entertainers have been injured in their person, business, and property by reason of these violations as described above, and would not been injured had Defendants not conspired to violate O.C.G.A 16-14-4 (a) and (b).

163.

Injuries suffered by Ms. Valente and entertainers were directly and proximately caused by Defendants' racketeering activity as described above in Count III.

164.

Defendants' actions outlined above were intentional, planned, willful and exhibited reckless indifference towards the Ms. Valente such as to warrant punitive damages.

165.

By reason of the foregoing, and as a direct and proximate result of

Defendants' illegal activities as described above and in Count III, Ms. Valente has suffered damages. Ms. Valente is therefore entitled to compensatory damages, equitable relief, punitive damages, cost and reasonable attorneys' fees. By virtue of these violations of O.C.G.A. 16-14-4 (c), Defendants are liable to Ms. Valente for three times the damages Plaintiff Valente sustained, punitive damages, equitable and injunctive relief, and the cost of this suit, including reasonable attorney's fees.

## COUNT V
## SLANDER/DEFEMATION

166.

Plaintiff restates and incorporates herein by reference the preceding paragraphs as if fully set forth herein.

167.

Defendant Hagood has intentionally and without privilege caused to be published to third parties false and malicious statements about Plaintiff Valente which he knew to be false when made. Defendant Hagood has made various statements to the press, including without limitation to the Atlanta Journal-Constitution in January of 2017, contending that Valente is engaging in "extortion."

168.

Defendant Hagood has slandered and defamed Ms. Valente by wrongfully and publicly disclosing to third persons that the Defendant has engaged in the criminal conduct and crime of "extortion."

169.

The wrongful disclosure of the aforementioned statement has wrongfully depicted the Plaintiff Valente as something she is not, and was calculated to harm her reputation as a professional and productive member of society.

170.

Defendant Hagood published these defamatory statements to third parties, including but not limited to the press, and made a false charge against Ms. Valente in reference to her trade and which were calculated to harm her.

171.

As a direct result of Defendant Hagood's defamation of the Ms. Valente, her reputation has been harmed.

172.

As a direct result thereof, Defendant Hagood has committed the intentional tort of defamation or slander per se upon the Ms. Valente, and damages are inferred.

173.

Defendant Hagood, knowing said facts to be false, acted improperly, without privilege, purposely, with malice and with intent to injure the Ms. Valente.

174.

Based on the foregoing wrongful conduct, by Defendant Hagood, which was knowing, willful, malicious, intentional, reckless and/or grossly negligent, Plaintiff is entitled to an award of general and punitive damages in the amount to be determined at trial.

## COUNT VI
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

175.

Plaintiff restates and incorporates herein by reference the preceding paragraphs as if fully set forth herein.

176.

On at least the night of February 24, 2015, through his violent screaming and seething through his teeth in close proximity to Ms. Valente, Defendant Lee acted with intent and recklessly to create emotional distress in Ms. Valente. Such conduct directed to Ms. Valente was extreme and outrageous due to his large physical stature as compared to Ms. Valente's physical stature, the general hostile, aggressive, and abusive atmosphere of The Cheetah, and the fact that other floor

managers at The Cheetah had prior inflicted physical injury on Ms. Valente (as described herein).

### 177.

This conduct was directed to Plaintiff Valente without provocation and/or justification and was unwanted, harmful, and offensive.

### 178.

This conduct from Defendant Lee caused severe emotional distress in Ms. Valente in the forms described herein, including creating an irregular menstrual cycle in her, creating the need for mental health assistance from therapists and acupuncturists.

### 179.

As a direct and proximate result of Defendant Lee's extreme and outrageous conduct directed toward and upon her, Plaintiff Valente suffered severe emotional distress and damages to be proven at trial.

### 180.

Based on the foregoing wrongful conduct, by Defendant Lee, which was knowing, willful, intentional, reckless and/or grossly negligent, Plaintiff is entitled to an award of punitive damages in the amount to be determined at trial.

## **COUNT VII**

## ASSAULT

### 181.

Plaintiff restates and incorporates herein by reference the preceding paragraphs as if fully set forth herein.

### 182.

On at least the night of February 24, 2015, through his violent screaming and seething through his teeth in close proximity to Ms. Valente, Defendant Lee acted with intent to create an apprehension that an injury may be inflicted against Ms. Valente.

### 183.

Defendant Lee had a reasonable apparent present ability to inflict such injury due to his large physical stature as compared to Ms. Valente's physical stature.  As noted elsewhere in this Complaint, the general hostile, aggressive, and abusive atmosphere of The Cheetah, and the fact that other floor managers at The Cheetah indeed inflicted physical injury on Ms. Valente, created an imminent threat to Ms. Valente of bodily injury that was reasonable.

### 184.

As a direct and proximate result of Defendant Lee's assault upon her, Ms. Valente suffered damages to be proven at trial.

185.

Based on the foregoing wrongful conduct, by Defendant Lee, which was knowing, willful, intentional, reckless and/or grossly negligent, Plaintiff is entitled to an award of punitive damages in the amount to be determined at trial.

## COUNT VIII
## VICARIOUS LIABILITY OF DEFENDANT THE CHEETAH

186.

Plaintiff restates and incorporates herein by reference the preceding paragraphs as if fully set forth herein.

187.

Plaintiff Lee was an employee or independent contractor employed by The Cheetah at the time of factual occurrences and incidents that form the bases of Counts IX and X.

188.

Defendant The Cheetah is liable for its servant Defendant Lee's actions and responsible for any damages awarded as stated in Counts IX and X under the doctrine of respondent superior because Defendant Lee was acting in furtherance of The Cheetah's business and was acting within the course and scope of The Cheetah's business.  Defendant Lee was present on the physical premises leased

by The Cheetah and in the building in which The Cheetah conducts its business under the employ or under contract with The Cheetah.

## COUNT IX
## PUNITIVE DAMAGES

### 189.

Plaintiff restates and incorporates herein by reference the preceding paragraphs as if fully set forth herein.

### 190.

Defendants Hagood's, Lee's, and The Cheetah's conduct, referenced above in Counts V-VIII, and Defendants' conduct outlined above in Counts I-IV, constitutes the intentional and reckless disregard and indifference of the rights of Ms. Valente, thereby justifying the imposition of punitive damages in an amount to be determined by the enlightened conscience of a jury of her peers.

### 191.

With respect to Counts III-VIII, the intentional disregard and indifference of the rights of Ms. Valente with the specific intent of causing her harm eliminates the applicability of any statutory limitation upon the amount of punitive damages.

### 192.

## PRAYER FOR RELIEF

Ms. Valente demands a trial by struck jury on all her claims so triable.

**WHEREFORE**, Plaintiff respectfully prays that this Court grant relief as follows:

a.  Issue a declaratory judgment that the actions, practices, procedures, conditions and customs of the Enterprise and Defendants are in violation of 18 U.S.C. § 1962;

b.  Grant the Plaintiff a permanent injunction enjoining the The Cheetah, their agents, successors, employees, attorneys and those acting in concert with Defendants and at Defendants request from continuing to violate 18 U.S.C. § 1962;

c.  Impose under 18 U.S.C. § 1964 the equitable relief of divestiture and dissolution of the Enterprise, The Cheetah, Trac-Eric, and National Limousine, including restrictions on the future activities or investments all Defendants, and the prohibition all Defendants from engaging in the adult entertainment industry;

d.  Disgorge under 18 U.S.C. § 1964 all proceeds derived from Defendants' unlawful conduct;

e.  Appoint Court Officers to administer the affairs and operations of

Defendants The Cheetah, Trac-Eric, and National Limousine, and assist the courts in monitoring compliance with the Courts' orders and in imposing sanctions for violations of the Courts' orders;

f.  Award Plaintiff treble damages and attorneys' fees;

g.  That Plaintiff recover and receive a judgment against Defendant Hagood for general and punitive damages in an amount to be proven at trial;

h.  That Plaintiff recover and have judgment entered against Defendant Lee for general and punitive damages in an amount to be proven at trial;

i.  That The Cheetah be held to be vicariously liable for any judgment levied against Defendant Lee;

j.  That Plaintiff recover and have judgment entered against Defendants for general and punitive damages in an amount to be proven at trial;

k.  Award Plaintiff costs of this action, including expert fees and expenses;

l.  Issue a declaratory judgment that the actions, practices, procedures, conditions and customs of the Enterprise and Defendants are in

violation of O.C.G.A. 16-14-6;

m.     Grant the Plaintiff a permanent injunction enjoining the The Cheetah, their agents, successors, employees, attorneys and those acting in concert with Defendants and at Defendants request from continuing to violate O.C.G.A. 16-14-6;

n.     Pursuant to O.C.G.A. 16-14-6,

- Order Defendants to divest themselves of any interest in the Enterprise, real property, and personal property;

- Order the dissolution or reorganization of the Enterprise and The Cheetah;

- Order the suspension or revocation of any license, permit, or prior approval granted to the Defendants issued by any agency of the state related to the entertainment industry;

- A finding that the board of directors or a managerial agent acting on behalf of The Cheetah, in conducting affairs of the corporation, has authorized or engaged in conduct in violation of Code Section 16-14-4 and that, for the prevention of future criminal activity, the public interest requires that the charter of the corporation be forfeited and that the corporation be

dissolved or the certificate be revoked; and

• Order the forfeiture of the charter of The Cheetah.

o. Grant Plaintiff a trial on all issues so triable; and

p. Award Plaintiff such other and further relief as the Court may deem just and proper.

Respectfully submitted,
Date:  February 28, 2017

/s/ James F. McDonough, III.
JAMES F. MCDONOUGH, III.
GA Bar No.:  117088
jmcdonough@hgdlawfirm.com
HENINGER GARRISON DAVIS, LLC
3621 Vinings Slope, Suite 4320
Atlanta, GA 30339
Tel: 404-996-0869
Fax: 205-326-3332

*Attorney for Alison Valente*

## **<u>CERTIFICATE OF COMPLIANCE</u>**

This is to certify that the foregoing has been prepared using Times New Roman 14 point font.

Date:  February 28, 2017

/s/ James F. McDonough, III.

JAMES F. MCDONOUGH, III.
GA Bar No.:  117088
HENINGER GARRISON DAVIS, LLC
3621 Vinings Slope, Suite 4320
Atlanta, GA 30339
Tel: 404-996-0869
Fax: 205-326-3332

Attorney for Alison Valente

## <u>VERIFICATION</u>

I, Alison Valente, pursuant to 28 U.S.C. § 1746, declare as follows:

1.     I am a Plaintiff in the present case and a citizen of the United States of America and the State of Georgia, and I am over the age of 18 years old.

2.     I have personal knowledge of myself, my activities, and my intentions, including those set out in the foregoing Verified Complaint, and if called on to testify, I would competently testify as to the matters stated herein.

3.     I have personal knowledge of Defendants' activities and actions, including those set out in the foregoing Verified Complaint, and if called on to testify, I would competently testify as to the matters stated herein.

4.     I verify under penalty of perjury under the laws of the United States of America and the State of Georgia that the factual statements in this Verified Complaint concerning myself, my activities, and my intentions are true and correct, as are the factual statements concerning Defendants activities and actions, except so far as they are therein stated to be on information, and that, so far as they are therein stated to be on information I believe them to be true.  28 U.S.C. § 1746.

This 22nd day of February, 2017.

_____
Alison Valente